KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Linda D. Kornfeld (SBN 155765)
lkornfeld@kasowitz.com
2029 Century Park East, Suite 750
Los Angeles, CA 90067
Telephone: (424) 288-7900
Facsimile: (310) 943-3551

William M. Goodman (SBN 61305)
wgoodman@kasowitz.com
101 California Street, Suite 2300
San Francisco, CA 94111
Telephone:  (415) 421-6140

Clarine Nardi Riddle (admitted *pro hac vice*)
cnriddle@kasowitz.com
2200 Pennsylvania Avenue NW
Suite 680 West
Washington, DC 20037
Telephone: (202) 760-3400

Aaron H. Marks (admitted *pro hac vice*)
amarks@kasowitz.com
Jennifer S. Recine (admitted *pro hac vice*)
jrecine@kasowitz.com
1633 Broadway
New York, NY 10019
Telephone:  (212) 506-1700
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BEVERLY HILLS UNIFIED SCHOOL DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL TRANSIT ADMINISTRATION; PETER M. ROGOFF, in his official capacity as Administrator, Federal Transit Administration; LESLIE T. ROGERS, in his official capacity as Regional Administrator, Federal Transit Administration Region IX Office; and ANTHONY FOXX, in his official capacity as Secretary, United States Department of Transportation,<br><br>Defendants. | No. CV 12-9861-GW (SSx)<br>Consolidated with<br>No. CV 13-1144-GW (SSx)<br><br>Hon. George H. Wu<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

FILED
CLERK, U.S. DISTRICT COURT
NOV 21 2013
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

RECEIVED BUT NOT FILED
CLERK, U.S. DISTRICT COURT
NOV 21 2013
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

**COMPLAINT FOR DECLARATORY AND**

**INJUNCTIVE RELIEF**

Plaintiff Beverly Hills Unified School District ("BHUSD" or "Plaintiff") alleges the following against Defendants Federal Transit Administration ("FTA"), Peter M. Rogoff, in his official capacity as Administrator of the FTA, Leslie T. Rogers, in his official capacity as Regional Administrator, FTA Region IX, and Anthony Foxx, in his official capacity as Secretary, United States Department of Transportation (collectively, "Defendants"):

**INTRODUCTION**

1.     The FTA has violated federal law by choosing Constellation Boulevard as the location for a Century City subway station when it approved the construction of the Westside Subway Extension Project ("Project").

2.     The Constellation Boulevard location, which requires tunneling directly underneath the Beverly Hills High School ("BHHS") Campus, was chosen based on flawed, biased and incomplete environmental analyses, raises serious safety issues, and will prevent BHHS from meeting the needs of its students.

3.     Throughout the multi-year planning process for the Project, the FTA and Metro publicly purported to be pursuing two alternatives for the Century City subway station.  In fact, until October 2011, the FTA's and Metro's public filings concerning the Project cited Santa Monica as the "base" or preferred alternative for that station.  But, during most of this time period, the FTA and Metro were actually only pursuing the Constellation location.  The FTA and Metro failed to publicly disclose the decision to locate the Century City station at Constellation Boulevard in order to avoid the public backlash they believed would result from the disclosure.  In the meantime, with public comment held in check, the FTA and Metro engaged in studies rationalizing their predetermined placement of the Century City station at Constellation Boulevard.

4.     In July 2010, before beginning their assessment of "alternatives" in

AMENDED COMPLAINT

1  earnest, Metro and the FTA committed themselves, and significant resources to the
2  Constellation Boulevard location.  Yet, in September 2010, Metro issued a Draft
3  Environmental Impact Statement ("DEIS") which identified the Santa Monica
4  location as the "base" or preferred location for the Century City station.
5  Thereafter, Metro and the FTA continued to represent to the public that the
6  preferred location for the Century City subway station was at Santa Monica
7  Boulevard and Avenue of the Stars.

8      5.     It was not until October 2011, one year after the close of the public
9  comment period, that Metro publicly disclosed for the first time its decision to
10  proceed with a station along Constellation Boulevard.  Yet, Metro's and the FTA's
11  seismic studies purportedly supporting this conclusion were commissioned and
12  undertaken *after* they had already decided where the station would be located.  As
13  a result, the studies were designed to support this conclusion, as opposed to
14  objectively evaluate alternatives.  The seismic studies produced by this flawed
15  process exaggerated evidence of faults at Santa Monica Boulevard, while
16  overlooking the evidence and potential impact of specific faults at Constellation
17  Boulevard, located only 1000 feet away.  Because of likely deep fill soils at the site
18  of the Constellation Boulevard location, this location could be more vulnerable to
19  seismic risks than a station located at Santa Monica Boulevard.   Notwithstanding
20  these serious environmental concerns, in a rush to judgment, Metro and the FTA
21  approved the re-location of the Project's proposed Century City subway station
22  from Santa Monica Boulevard to a new location at Constellation Boulevard.

23      6.     Metro's seismic studies caused serious concern and prompted Plaintiff
24  to initiate independent seismic studies using more precise methodologies, more
25  advanced technologies, and more extensive examination than Metro's seismic
26  studies.  The resulting reports called into question the basic findings of Metro's
27  seismic studies, and this concern is echoed in various reports issued by other
28  experts.

2

AMENDED COMPLAINT

7.      As further evidence that the Agencies' environmental studies and related discussions amounted to nothing more than a *post hoc* rationalization that minimized the legitimate environmental concerns, the FTA's and Metro's Final Environmental Impact Statement ("FEIS") does not address the new data generated by Plaintiff's or others' independent seismic studies, and it pays little attention to other safety issues, such as the presence of methane and hydrogen sulfide at the Constellation Boulevard location.

8.      In addition, in selecting Constellation Boulevard, Metro and the FTA failed to consider that construction of the Constellation Boulevard subway station and tunneling underneath the Campus will severely limit the use of the campus, which is a protected historic and recreational resource for students and the public. Portions of the tunnel are planned for a depth so shallow that it will cause vibrations and noise disruptions in the school buildings above.  The tunneling required for the Constellation Boulevard location will also prevent BHHS – the only public high school in the City of Beverly Hills – from expanding as it needs to in order to accommodate the growing student population.  BHHS has long planned for its future growth through a $334 million Master Plan, and expansion of the Campus relies on significant underground development because of limited open land and state law restrictions. Metro knew about the Master Plan while it was deciding on a location for the subway station, yet Metro and the FTA came to the implausible conclusion that tunneling underneath BHHS would not result in any impairment to BHHS.

9.      The Constellation Boulevard location is rife with problems.  In contrast, the Santa Monica Boulevard location would result in faster transit times and would be hundreds of millions of dollars less expensive, and the subway would run in the public right of way.  However, Metro has held a consistent bias against the Santa Monica Boulevard location and in favor of the Constellation Boulevard location, even as it purported to consider both alternatives. Defendants

AMENDED COMPLAINT

1    must be prohibited from continuing the Westside Subway Extension Project with

2    the Constellation Boulevard location.

3                          **JURISDICTION AND VENUE**

4         10.   This Court has subject matter jurisdiction under 28 U.S.C. § 1331

5    (federal question), 28 U.S.C. § 1361 (action to compel an officer of the United

6    States to perform his duty), and 28 U.S.C. §§ 2201-2202 ("creation of remedy" and

7    "further relief" provisions establishing power to issue declaratory judgments in

8    cases of actual controversy).  Plaintiff has a right to bring this action pursuant to,

9    *inter alia*, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 and 23

10   U.S.C. § 139(k)-(l).  FTA's issuance of the Record of Decision approving the FEIS

11   constitutes final agency action. 77 Fed. Reg. 51,106 (Aug. 23, 2012).

12        11.   Venue is proper in the Central District of California under 28 U.S.C. §

13   1391 because members of Plaintiff live in the District; land affected by the action

14   is located in the District; and a substantial part of the acts or omissions giving rise

15   to this Complaint occurred in the District.

16        12.   Venue is proper in the Western Division of the Central District of

17   California because the land at the subject of this action is in Los Angeles County,

18   and because a substantial part of the acts or omissions giving rise to this Complaint

19   occurred in Los Angeles County.

20                              **THE PARTIES**

21        13.   Plaintiff is a unified school district in the City of Beverly Hills

22   organized and operating under the public education laws of the State of California.

23   BHUSD is responsible for administering and overseeing all public education

24   within the City.  BHUSD is governed by a five-person Board of Education that is

25   elected by the residents of the City.

26        14.   Defendant FTA is the federal agency charged with approving projects

27   for funding under the New Starts program, which is the primary federal funding

28   mechanism for locally planned, implemented, and operated transit projects,

                                        4

                                                        AMENDED COMPLAINT

1   including the Westside Subway Extension Project.  The FTA is responsible for

2   complying with NEPA in connection with any decisions involving major federal

3   actions.  The FTA is responsible for complying with Section 4(f) and Section 106

4   in connection with actions affecting historic or recreational properties.  Together

5   with Metro, who prepared the EIS on which the FTA relied (*see, e.g.*, 23 C.F.R.

6   § 771.109(c)), the FTA issued the DEIS and the FEIS for the Project in September,

7   2010 and March 2012, respectively.  The FTA independently issued the Record of

8   Decision ("ROD") selecting the Constellation Boulevard Alternative on August 9,

9   2012.

10          15.   Defendant FTA is a federal government agency within the U.S.

11  Department of Transportation and is authorized to plan and implement new transit

12  infrastructure or improvements to existing infrastructure.  Regional FTA Offices

13  prepare and participate in environmental impact assessments of federally-funded

14  projects and have review authority for the final action decision.  The FTA is the

15  lead agency for the Project with regard to NEPA and is charged with the duty of

16  ensuring compliance with NEPA, Section 4(f), Section 106, and other applicable

17  federal laws.

18          16.   Defendant Peter M. Rogoff is the Administrator of the FTA, and he is

19  responsible for all FTA activities.   Defendant Rogoff is sued in his official

20  capacity.

21          17.   Defendant Leslie T. Rogers is the Regional Administrator of the

22  FTA's Region IX Office and is the FTA official responsible for issuance of the

23  ROD.  Defendant Rogers is sued in his official capacity.

24          18.   The United States Department of Transportation is the parent

25  department of the FTA and maintains overall responsibility for compliance with

26  NEPA.

27

28

5

AMENDED COMPLAINT

19.     Defendant Anthony Foxx is the Secretary of the U.S. Department of Transportation and is responsible for all Department of Transportation activities. Defendant Foxx is sued in his official capacity.

**STATUTORY AND REGULATORY BACKGROUND**

A.     **National Environmental Policy Act ("NEPA")**

20.     NEPA requires federal agencies undertaking any major federal action to review the environmental impacts of the proposed action and to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(C), (E). NEPA's purpose is two-fold: first, to ensure that federal agencies undertaking a major federal action take a hard look at the proposed project's environmental impacts before deciding how to proceed, and, second, to ensure that relevant information about the impacts of a proposed project and its alternatives is made available to members of the public to provide the public with a meaningful opportunity for public comment and participation in the federal decision-making process.

21.     The Council on Environmental Quality ("CEQ") has promulgated regulations applicable to all federal agencies undertaking a NEPA review. 40 C.F.R. Part 1500. Individual agencies supplement the CEQ regulations with agency-specific regulations; NEPA regulations applicable to FTA and Federal Highway Administration ("FHWA") actions are set forth at 23 C.F.R. Part 771.

22.     The CEQ regulations direct federal agencies to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse impacts of these options upon the quality of the human environment." 40 C.F.R. § 1500.2(e). The regulations stress that the alternatives analysis of an EIS "is the heart of the environmental impact statement" and therefore require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14.

AMENDED COMPLAINT

23.     Essential to an agency's obligations under NEPA is the duty to insure that "high quality" environmental information is available to the public before decisions are made and before actions are taken. *Id.* at § 1500.1(b).  Agencies are to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." *Id.* at § 1506.6(a).  Further, agencies are to hold or sponsor public hearings or meetings whenever appropriate, including when there is "[s]ubstantial environmental controversy concerning the proposed action or substantial interest in holding the hearing." *Id.* at § 1506.6(c)(i).

24.     The CEQ NEPA regulations provide for coordination between federal agencies subject to NEPA and state and local agencies "to reduce duplication between NEPA and State and local requirements." *Id.* at § 1506.2(a).  State and local agencies such as Metro may act as joint lead agencies, together with at least one federal agency, to prepare an EIS. *Id.* at § 1501.5(a)(b).  However, both the CEQ and FHWA-FTA regulations require federal agencies to independently evaluate and take responsibility for information considered in the environmental review.  *Id.* at § 1506.5; 23 C.F.R.  § 771.109(c)(2) (state or local government entities that serve as joint lead agencies with the FTA "may prepare environmental review documents" if the FTA "furnishes guidance and independently evaluates the documents") and (c)(5) ("a public agency that has state-wide jurisdiction (for example a State highway agency or a State department of transportation) or a local unit of government acting through a statewide agency … may prepare the EIS and other environmental review documents with the [FTA] furnishing guidance, participating in the preparation, and independently evaluating the document").

25.     The CEQ NEPA regulations emphasize that "[a]ccurate scientific analysis … and public scrutiny are essential to implementing NEPA." *Id.*  NEPA directs agencies to, *inter alia*, "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." *Id.* at § 1500.2(d).

7

AMENDED COMPLAINT

26.     An agency preparing an environmental impact statement ("EIS") must discuss in detail the environmental impacts of the proposed action and its alternatives, including issues related to "urban quality, historic and cultural resources, and the design of the built environment." *Id*. at § 1502.16(g).

27.     The FTA-FHWA joint regulations supplementing the CEQ regulations provide that the agencies should evaluate alternatives and make decisions "in the best overall public interest based upon a balanced consideration of the need for safe and efficient transportation; of the social, economic, and environmental impacts of the proposed transportation improvement; and of national, State, and local environmental protection goals." 23 C.F.R. § 771.105(b).

28.     The CEQ regulations require that agencies "make every effort to disclose and discuss at appropriate points in the draft environmental impact statement all major points of view on the environmental impacts of the alternatives including the proposed action." 40 C.F.R. § 1502.9(a). Agencies are required to discuss at appropriate points in the FEIS any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised. *Id*. at § 1502.9(b).

29.     Agencies must supplement a draft or final EIS if "(1) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (2) there are significant[1] new circumstances or information relevant to

[1]     The term "significantly," as used in the NEPA context, "requires considerations of both context and intensity." 40 C.F.R. § 1508.27. In terms of "context," this means that an agency must consider significance to, *inter alia*, the affected region, the affected interests, and the locality, including both short- and long-term effects. *Id*. at § 1508.27(a). The consideration of "intensity" turns on an evaluation of ten factors, including, *inter alia*, the degree to which the proposed action affects public health or safety; unique characteristics of the area such as proximity to historic or cultural resources and park lands; the degree to which the effects on the human environment are likely to be "highly controversial"; the degree to which environmental effects are "highly uncertain or involve unique or unknown risks;" and the degree to which the action may adversely impact or cause loss or destruction of significant cultural or historical resources. *Id*. at § 1508.27(b).

1   environmental concerns and bearing on the proposed action or its impacts." *Id.* at

2   § 1502.9(c)(1); 23 C.F.R. § 771.130(a).  Agencies may supplement an EIS when

3   "the agency determines that the purposes of [NEPA] will be furthered by doing

4   so." 40 C.F.R. § 1502.9(c)(2).  The FHWA-FTA NEPA guidelines further provide

5   that a supplemental DEIS "may be necessary for major new fixed guideway capital

6   projects proposed for the FTA funding [such as the Westside Subway Extension

7   Project] if there is a substantial change in the level of detail on project impacts

8   during project planning and development." 23 C.F.R. § 771.130(e).   The

9   regulations provide that, in such cases, the supplement shall address "site-specific

10  impacts and refined cost estimates that have been developed since the original

11  [DEIS]." *Id.*

12       30.   For major new fixed guideway capital projects proposed for the FTA

13  funding, such as the Westside Subway Extension Project, the FHWA-FTA NEPA

14  regulations provide that the FTA may give approval to begin preliminary

15  engineering ("PE") "on *the principal alternative(s) under consideration* after

16  circulation of a [DEIS] and consideration of comments received."   *Id.* at

17  § 771.123(j) (emphasis added).[2]  The regulations further provide that, during PE,

18  "the applicant will refine project costs, effectiveness, and impact information *with*

19  *particular attention to alternative designs*, operations, detailed location decisions

20

21

---

22     [2]   This provision is currently reserved by 78 Fed. Reg. 26.  *See* Envt'l Impact
23  and Related Procedure, 78 Fed-Reg. 26, 8980 (Feb. 7, 2013)(to be codified at 23
    C.F.R. § 771.123(j)).  However, the New Start regulations state that "a New Starts
24  project which has been approved for entry into preliminary engineering under the
    regulations in existence prior to the effective date of this rule shall be considered to
25  be in the engineering phase of the New Starts process." 49 C.F.R. § 611.103; *see*
    *also* 49 C.F.R. § 611.105 (defining engineering as "a phase of development for
26  New Starts projects during which the scope of the proposed project is finalized;
    estimates of project cost, benefits, and impacts are refined; project management
27  plans and fleet management plans are developed; and final construction plans
    detailed specifications, final construction cost estimates, and bid documents are
28  prepared . . . .").

9

1  and appropriate mitigation measures.  These studies will be used to prepare the

2  final EIS or, where appropriate, a supplemental draft EIS." *Id.* (emphasis added).

3       31.  Under the CEQ NEPA regulations, "[w]hen an agency is evaluating

4  reasonably foreseeable significant adverse effects on the human environment in an

5  environmental impact statement and there is incomplete or unavailable

6  information, the agency shall always make clear that such information is lacking."

7  40 C.F.R. § 1502.22.  Further, if the incomplete information "is essential to a

8  reasoned choice among alternatives" and the costs to obtain complete information

9  are "not exorbitant," the agency *must* include complete information in the EIS.  *Id.*

10  at § 1502.22(a).

11      **B.**    **Transportation Infrastructure Finance and Innovation Act**

12       32.  The Transportation Infrastructure Finance and Innovation Act

13  ("TIFIA"), Pub. L. 105-178, 112 Stat. 107, 241 (1998), codified at 23 U.S.C.

14  §§ 601-609, provides a mechanism for federal funding of nationally or regionally

15  significant surface transportation projects such as the Westside Subway Extension

16  Project.  TIFIA requires that, in determining eligibility of applicant projects, DOT

17  consider, *inter alia*, "[t]he extent to which the project helps maintain or protect the

18  environment."  23 U.S.C. § 602(b)(vii), 49 C.F.R. § 80.15(a)(7) (as one of eight

19  relevant criteria, environmental impacts are to be weighed as one-fifth of the

20  evaluation and selection process).  Funds granted under the TIFIA program must

21  comply with NEPA.  *Id.* at § 602(c); 49 C.F.R. § 80.9(c).  DOT is prohibited from

22  obligating funds for a project that has not received an environmental Categorical

23  Exclusion, a Finding of No Significant Impact, or a Record of Decision as a result

24  of the NEPA process.  49 C.F.R. § 80.6(f).  Plaintiff asks this Court to provide the

25  relief requested herein to ensure that DOT does not rely on the incomplete and

26  erroneous Westside Subway Extension FEIS to extend TIFIA funds to Metro for

27  this project.

28

AMENDED COMPLAINT

C.   **Department of Transportation Act of 1966, Section 4(f)**

33.   Section 4(f) of the Department of Transportation ("DOT") Act of 1966, codified at 49 U.S.C. § 303 and 23 U.S.C. § 138, allows the Secretary of Transportation to "approve a transportation program or project … requiring the use of publicly owned land of a public park, recreation area … of national, State, or local significance, or land of an historic site of national, State, or local significance … *only if* (1) there is no prudent and feasible alternative to using that land; *and* (2) the program or project includes all possible planning to minimize harm to the park, recreation area, … or historic site resulting from the use." 49 U.S.C. § 303(c) (emphasis added).

34.   The FTA and FHWA regulations implementing Section 4(f)  specify that a "use" occurs "(1) [w]hen land is permanently incorporated into a transportation facility; (2) [w]hen there is a temporary occupancy of land that is adverse in terms of the statute's preservation purpose as determined by the criteria in [40 C.F.R.] § 774.13(d); or (3) [w]hen there is a *constructive use* of a Section 4(f) property as determined by the criteria in [23 C.F.R.] § 774.15."  23 C.F.R. § 774.17 (emphasis added).

35.   A temporary occupancy of a Section 4(f) property constitutes a use unless *all* of the following criteria are satisfied: "(1) [d]uration must be temporary, *i.e.*, less than the time needed for construction of the project…; (2) [s]cope of the work must be minor, *i.e.*, both the nature and the magnitude of the changes to the Section 4(f) property are minimal; (3) [t]here are no anticipated permanent adverse physical impacts, nor will there be interference with the protected activities, feature, or attributes of the property, *on either a temporary or permanent basis*; [**and**] (4) [t]he land being used must be fully restored, *i.e.*, the property must be returned to a condition which is at least as good as that which existed prior to the project … ."  *Id.* at § 774.13(d) (emphasis added).

11

36.     A "constructive use" occurs when a transportation project does not incorporate land from a Section 4(f) property but nonetheless has such a severe impact on the property, due to the project's proximity, "that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired." *Id.* at § 774.15(a).   "Substantial impairment" occurs when "the protected activities, features, or attributes of the property are substantially diminished." *Id.*  The FHWA's Section 4(f) policy explains that, in the context of tunneling projects, "substantial diminishment" occurs when "the value of the resource in terms of its Section 4(f) significance will be meaningfully reduced or lost.  The degree of impact and impairment should be determined in consultation with the officials having jurisdiction over the resource." FHWA Section 4(f) Policy Paper (2005) ("FHWA Policy") at 22.  The FHWA Policy further provides that, in the case of tunneling, Section 4(f) applies where, *inter alia*, the tunneling "[s]ubstantially impairs the value of [a] historic site," or where tunneling "would permanently harm the purposes for which the park [or] recreation [area] … was established." *Id.*

37.     The  FHWA-FTA  regulations  require  determinations  regarding constructive use  to be based upon the following: (1) identification of the current activities, features, or attributes of the property which render it a Section 4(f) property and which may be impacted due to proximity of the project; (2) an analysis of the net (*i.e.*, taking into consideration mitigation) proximity impacts of the project on the Section 4(f) property; and (3) consultation regarding the foregoing factors with the official(s) having jurisdiction over the Section 4(f) property.  23 C.F.R. § 774.15(d).  DOT has declared that constructive uses occur in certain situations including, *inter alia*, where the project "results in a restriction of access which substantially diminishes the utility of a [Section 4(f) property]" or where "[t]he vibration impact from construction or operation of the project

AMENDED COMPLAINT

1 | substantially impairs the use of a Section 4(f) property . . . ." *Id.* at § 774.15(e)(3)-
2 | (4).
3 |       38.    In order to proceed with use of a Section 4(f) property, DOT must
4 | determine that no "feasible and prudent alternative" exists, and that "the use of the
5 | property … will have a *de minimis* impact … on the property." 23 C.F.R. § 774.3.
6 | The Section 4(f) regulations define a "feasible and prudent alternative" as one that
7 | "avoids using Section 4(f) property and does not cause other severe problems of a
8 | magnitude that substantially outweighs the importance of protecting the Section
9 | 4(f) property." *Id.* at § 774.17.  A "*de minimis* impact" means that, for historic
10 | sites, "no historic property is affected by the project or that the project will have
11 | 'no adverse effect' on the property in question;" for parks and recreation areas, a
12 | *de minimis* impact is one that "will not adversely affect the features, attributes, or
13 | activities qualifying the property for protection under Section 4(f)." *Id.*
14 |       39.    DOT policy makes plain that determinations regarding applicability of
15 | Section 4(f) should consider planned uses for properties.  The FHWA Policy
16 | provides that Section 4(f) applies in situations where a "planned facility is
17 | presently publicly owned, formally designated, and significant."  The FHWA
18 | Policy at 22.  While a mere expression of interest in pursuing plans does not rise to
19 | the level of "formal designation," the inclusion of the publicly-owned land and its
20 | function as a Section 4(f) resource "into a city or county Master Plan" triggers
21 | application of Section 4(f). *Id.*

**D.**    **National Historic Preservation Act, Section 106**

22 |
23 |       40.    Section 106 of the National Historic Preservation Act, 16 U.S.C. §
24 | 470f, requires Federal agencies to take into account the effects of their
25 | undertakings on historic properties and provide the Advisory Council on Historic
26 | Preservation  a reasonable opportunity to comment on such undertakings.
27 |
28 |

AMENDED COMPLAINT

**E.**   **Administrative Procedure Act**

41.   The Administrative Procedure Act, 5 U.S.C. §§ 701-706, provides for judicial review of federal agency determinations such as those at issue here.  The APA requires a reviewing court to hold unlawful and set aside any agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

**F.**   **Declaratory Judgment Act**

42.   The Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, authorizes "any court of the United States" to "declare the rights and other legal relations of any interested party seeking such declaration."

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.**   **Background: Approval of BHUSD's Development Plan; The Westside Subway Extension Project**

43.   In August 2008, to address overcrowding on the Campus and meet the long-term public education needs of the City, BHUSD released a draft five-year master plan ("Master Plan") that called for upgrading and modernizing many of the buildings on the Campus and included a detailed list of potential projects.  The Master Plan recognized that restrictions imposed by the California Field Act (California Education Code §§ 17280-17317, 80030-81149) would require significant underground development in connection with many of the proposed projects.  Parking and perhaps other facilities will need to go "down" because they cannot go "up" in light of height restrictions.  In November 2008, the City passed a $334 million school bond ("School Bond") to fund implementation of the Master Plan.  Correspondence between Metro and BHUSD reveals that Metro has been aware of the Master Plan, including the plans for underground development, since 2008.

44.   The Master Plan is a short-term fix to address the long-term needs of the Beverly Hills community over the next century.  BHHS is the primary public

AMENDED COMPLAINT

high school in the City, and acquisition of additional property is prohibitively expensive. Thus, the Campus will *remain* the primary public high school location in the City. Placing a subway tunnel under the Campus will limit the school's ability to develop underground. Those limits will affect the school's ability to expand – not only consistent with the current Master Plan, but also in future years to serve the projected increased population of Beverly Hills.

45. The Master Plan was consistent with everything BHUSD knew and understood about the potential westward extension of the Los Angeles subway system. Metro has been planning the Project for decades. And all along, Metro publicly identified Santa Monica Boulevard as the base location for any subway station in Century City.

46. In January 2009, Metro approved an Alternatives Analysis Study ("Alternatives Analysis") for the Project that was funded by the FTA, as required under the Federal New Starts program (49 U.S.C. § 5309(a), 49 C.F.R. § 611.7), and the FTA authorized Metro, as a joint lead agency for the Project, to prepare a DEIS. All of the alternatives considered in the Alternatives Analysis included a subway station in Century City, specifically considering two potential locations: Santa Monica Boulevard or, one block to the south, Constellation Boulevard.

47. Even though they are only approximately 1,000 feet apart, the Santa Monica Boulevard and Constellation Boulevard station locations produce dramatically different alignments. With the Santa Monica Boulevard Alternative, the subway tracks would run in the public right of way along Santa Monica Boulevard and entirely avoid tunneling beneath the Campus. By contrast, the Constellation Boulevard Alternative results in expanded and additional curves, with a longer, more expensive alignment, and requires tunneling directly through the heart of the Campus – an area that has long been identified as the "Prime Building Area" for carrying out the Master Plan.

**B.  Improper Preselection of the Constellation Boulevard Location**

AMENDED COMPLAINT

48.     As early as April, 2010, Metro had communicated to the FTA its preference for locating the Century City subway station at Constellation Boulevard.   The preliminary project justification rating templates, which Metro prepared and submitted to the FTA in support of its request for a rating under the New Starts program, identifies the station location at Constellation Boulevard Century City as the "currently favored" alternative location for the Century City station.

49.     Consistent with this preference, Metro engaged Parsons Brinckeroff to conduct a risk assessment for the Westside Subway Extension ("Project") –Twin Bore Alignment 2E, an alignment variation … that follows Constellation Boulevard into Century City in lieu of Santa Monica Boulevard for the Westside Subway Extension project.   Thereafter, Parsons Brinckeroff undertook an extensive assessment of the Project, which included a pre-workshop site tour; preparation of draft and schedule risk models; and a facilitation of a formal three day Risk Assessment Workshop.

50.     In connection with Parsons Brinckerhoff's assessment, in July 2010, four members of the FTA's staff attended a Risk Assessment Workshop for the Westside Subway Extension.   Notes prepared by the Project Management Oversight Consultants ("PMOC") indicate that at the workshop, the selection of the Constellation Boulevard station location was identified as a specific risk mitigation measure for the project.

51.     The product of the four-month long assessment was a Risk Assessment Report, prepared by Parsons Brinckerhoff, and submitted by Metro to the FTA, in support of Metro's proposal to initiate Preliminary Engineering ("PE") in accordance with the New Start program requirements.   The proposal identified

AMENDED COMPLAINT

Alignment 2E[3] as the base alignment and declined to pursue any risk assessment of the Santa Monica Boulevard alternative, conceding instead that only the Constellation Boulevard station was currently in the estimate. (BHUSD first became aware of this document through BHUSD's May, 2011 Freedom of Information Act request to the FTA for records related to the NEPA review and New Starts process for the Project.)

52.    In response to Metro's proposal, in August 2010, the FTA engaged Urban Engineers, Inc. ("Urban") to review the project documents prepared by Parsons Brinckerhoff and to formulate an opinion on the suitability of Metro's PE proposal.  Urban, as the PMOC for the PE assessment, conducted a four-month long assessment, culminating in a Risk Assessment report in support of the FTA's consideration of Metro's readiness to enter into PE.

53.    Significantly, notwithstanding Metro's identification of the Santa Monica Boulevard location as the "base" alignment in the DEIS issued in September 2010, neither Metro nor the FTA performed any risk assessments of the Santa Monica alternative prior to initiating PE analysis for the Century City station.  Despite the opportunity to pursue risk analysis of both locations, Metro explicitly excluded the Santa Monica alternative from its proposal.  Instead, Metro committed significant resources for the selection of the Constellation Boulevard location in the form of an extensive third-party risk assessment and testing.  The FTA's follow-up assessments, which were limited to the scope of Metro's recommended project alternative, ratified Metro's selection of Constellation Boulevard and failed to assess the Santa Monica alternative, or require concurrent risk analysis of the Santa Monica location.  The FTA explicitly supported Metro's

---

[3] Alignment 2E included the following seven new subway stations: Wilshire/Rodeo, Century City (Constellation), UCLA, Westwood, and VA Hospital."

AMENDED COMPLAINT

1   predetermination, and on January 4, 2011, based on Urban's findings, the FTA
2   approved initiation of PE for the Westside Subway Extension, thereby authorizing
3   Metro to improperly commit additional resources to its chosen location prior to the
4   completion of a proper environmental assessment.

5       54.   Metro's submission of, and the FTA's acceptance of, the Risk
6   Assessment report, which failed to evaluate both alternative sites for the station,
7   strongly suggest that the Agencies pre-judged the outcome of their NEPA
8   alternatives analysis.  With respect to New Starts, relevant information required
9   and considered by the FTA in support of the PE application was not for the full
10   Locally Preferred Alternative ("LPA") -- which encompassed both the Santa
11   Monica and Constellation Boulevard Alternatives -- contrary to the applicable New
12   Starts regulations.

13       55.   Further, the  Risk Assessment Report failed to address any specific
14   risks relating to tunneling under the Campus, including but not limited to
15   disruption and hazards to the Campus, increased cost, and significant delays
16   associated with acquiring  necessary subsurface rights under the Campus.

17       56.   Additional facts and examples of bias by Metro have been alleged in a
18   parallel case to this lawsuit, *Beverly Hills Unified School District vs. Los Angeles*
19   *County Metropolitan Transportation Authority*, Case No. BS137606, filed in Los
20   Angeles Superior Court on May 30, 2012 under the California Environmental
21   Quality Act (California Public Resources Code § 21100 *et seq*.) ("CEQA lawsuit").
22   The CEQA lawsuit describes a number of allegations concerning Metro's bias in
23   pre-committing to the Constellation Boulevard Alternative, including (1)
24   submitting documentation to the FTA for the New Starts program only for the
25   Constellation Boulevard Alternative even before it released the DEIS; (2) pushing
26   forward in reliance on the inadequate DEIS and refusing to allow public
27   participation and the inclusion of responsive and comprehensive data developed by
28   BHUSD; (3) refusing BHUSD's reasonable request for additional time to complete

AMENDED COMPLAINT

and present its scientific and environmental studies; and (4) certifying the FEIS before conducting a required public hearing on seismic issues relating to the Century City station location.

**C.**     **Issuance of the DEIS for the Project; Public Comment Period**

57.     In September 2010, Metro and the FTA issued the DEIS.   With respect to the Century City station location, the DEIS evaluated both the Santa Monica Alternative and the Constellation Boulevard Alternative and found that the Santa Monica Boulevard Alternative was tens of millions of dollars less expensive than the Constellation Boulevard Alternative.   It also found that a Santa Monica Boulevard Alternative would result in more riders than would a Constellation Boulevard Alternative and, due to significant curvature in the subway route required by a Constellation Boulevard Alternative, would result in reduced transit times.

58.     Although the DEIS identified the Santa Monica Boulevard Alignment as the "base" alignment, it raised for the first time the possibility that active earthquake faults along Santa Monica Boulevard might render the Santa Monica Alternative untenable.

59.     The DEIS does not indicate that Metro and the FTA preferred that the Century City station be located at Constellation Boulevard.

60.     BHUSD submitted comments on the DEIS within the public comment period.   BHUSD's comments raised several concerns about the potential impact of the Project on BHHS and its students.

61.     Metro approved the DEIS on October 28, 2010, and selected a LPA for the Project.   However, Metro found the DEIS's seismic analysis for the Century City station to be inconclusive and deferred the selection of the station site to allow for further study; the LPA included both alternative station locations.   During that same meeting, and in response to public concern, Metro committed to analyze the impacts of the preferred and alternative Century City stations and the alignments

19

associated with them.  In particular, Metro committed to analyze *in depth* the potential impacts of tunneling under the High School and consider alternatives that would avoid tunneling under the High School all together.

62.   In multiple letters sent to Metro following closure of the DEIS comment period after the announcement that the DEIS's seismic studies were inconclusive as to the viability of the Santa Monica location, BHUSD raised its specific concerns about the Project's possible impact on BHUSD's ability to carry out the Master Plan to the extent the Constellation Boulevard station was selected as the Century City station location.

63.   Notwithstanding the concerns specifically articulated by BHUSD, during the public comment period and over the following year, Metro continued to represent to the public that the Santa Monica Boulevard Alignment remained the base alignment.

64.   As set forth in more detail below, in response to seismic concerns with the Century City station alternatives, both BHUSD and the City hired experts to conduct their own studies.  These studies, which were provided to Metro and the FTA, demonstrated that the Constellation Boulevard Alternative could be equally if not more vulnerable to seismic risks than the Santa Monica Boulevard Alternative.  The Constellation Boulevard Alternative is sited in an area of deep fill soils and, therefore, it would be more subject to lateral racking from ground shaking than would a station located at Santa Monica Boulevard.

**D.   <u>Post-DEIS: Changes to the Proposed Project; Subsequent Studies</u>**

65.   In 2011, without any public discussion and with virtually no public notice, Metro moved the location of the purported Santa Monica Boulevard Alternative one block east, shifting it away from population centers such as the Westfield Mall.

66.   In October 2011 – <u>a full year after the close of the comment period on the DEIS</u> –Metro issued two seismic studies, titled "Century City Area Tunneling

20

Safety Report" and "Century City Area Fault Investigation Report" (collectively, the "Seismic Studies") containing significant new information that was not in the DEIS. The Seismic Studies also made, for the first time, the controversial assertion that there were two <u>active</u> fault zones in Century City that precluded selection of the Santa Monica Boulevard Alternative. The Seismic Studies concluded that, because of these active fault zones, the Constellation Boulevard Alternative was the only viable location for the Century City station. This conclusion in the Seismic Studies constituted the first public announcement that Metro and FTA had identified the Constellation Boulevard Alternative as the preferred location for the Century City Station, more than a year after the July 2010 Workshop, where the decision appears to have been made.

67. In response to this decision, in January 2012, the FTA's consultant expressed concern that insufficient fault investigation had been done with respect to the Constellation site. In response, Metro's consultant conceded that only nine of more than fifty borings cited in the 2010-2011 faulting investigation were useful for analyzing the Constellation Station location, but claimed there was nevertheless sufficient testing on Constellation. Yet, none of the purported borings on Constellation were "continuous core borings," the most accurate type of boring for assessing faulting. By contrast, during the same fault study eighteen continuous core borings were done on Santa Monica Boulevard and five were done near the Beverly Hills High School Campus. Similarly, there were only two cone penetrometer tests conducted anywhere near the Constellation Station, whereas there were fifty-eight such tests conducted near the Santa Monica site and twenty-eight conducted near the Beverly Hills High School. The two borings closest to the actual Constellation site were rotary wash borings, which are commonly understood to provide little utility in detecting faulting. The remainder of the nine borings cited by Metro's consultant were not actually borings conducted by Metro,

AMENDED COMPLAINT

1   but were private party borings done decades prior to the 2010-2011 seismic

2   studies.

3       68.     Despite these concerns, Metro and the FTA neglected to do any

4   meaningful seismic testing at the Constellation Boulevard Alternative to determine

5   whether that location -- located only approximately 1,000 feet from the Santa

6   Monica Boulevard Alternative -- might be similarly, or more severely, impacted by

7   fault zones.

8       69.     The public was extremely concerned with the validity of the Seismic

9   Studies, which could impact far more than the selection of the subway station

10  location.  Though this surprising development garnered significant media attention

11  and generated widespread public concern, the FTA provided no opportunity for a

12  public hearing or public review of or comment on this important seismic

13  information, notwithstanding repeated requests from Plaintiff and others.

14      70.     The new seismic information sparked a public controversy that

15  prompted several third parties, including the City and BHUSD, to initiate

16  independent seismic studies.  Immediately after the Seismic Studies were released,

17  BHUSD retained Leighton Consulting, Inc. ("Leighton") to conduct a

18  comprehensive investigation of seismic issues affecting the Campus and other

19  parts of Century City under the regulatory authority and direction of the California

20  Geological Survey ("CGS").  Leighton was required to conduct its study under the

21  review of CGS, the lead regulatory agency of the State of California responsible

22  for the State's Alquist-Priolo seismic fault hazards program, which prohibits any

23  occupied construction over active faults.  CGS is also the lead regulatory agency

24  responsible for specific review and approval of the geologic siting and engineering

25  of all local schools.  In contrast, Metro's Seismic Studies were not performed in

26  coordination with CGS.  CGS required Leighton to address the active faults alleged

27  by Metro using standard protocols, extensive direct examination, more precise

28

AMENDED COMPLAINT

1   methodologies and more advanced technologies than those used in the studies that
2   Metro cited to support its decision to change the Century City station location.

3        71.    Other experts also undertook seismic studies in response to Metro's
4   and the FTA's Seismic Studies, including a study conducted at the behest of the
5   City.   In fact, since publication of the DEIS, more than nine reports have been
6   issued concerning seismic and safety issues relating to the location of the Century
7   City Station. These reports uniformly raise serious questions regarding the
8   accuracy of the Seismic Studies that Metro relied on to change the location of the
9   Century City station.

10       72.    Had the Agencies accurately disclosed their true concerns about faults
11  in the vicinity of a proposed Santa Monica Boulevard station in the DEIS, BHUSD
12  would have initiated their studies at that time.   The Agencies' duplicity caused
13  BHUSD to delay its studies for over one year.

14       73.    On January 6, 2012, as Leighton and CGS worked to complete their
15  seismic studies, BHUSD formally requested that the FTA prepare, or require Metro
16  to prepare, a supplement to the EIS ("SDEIS") to address the growing body of
17  significant new seismic information and to provide the public the opportunity to
18  comment on that information.

19       74.    BHUSD again wrote the FTA on February 28, 2012, to request that
20  the FEIS not be released until Leighton and CGS had completed their work, and to
21  reiterate the request that Metro and the FTA prepare a SDEIS to address the new
22  seismic data.

23       75.    The FTA denied both of BHUSD's requests for a SDEIS in a letter
24  dated March 8, 2012.

25       76.    Despite substantial controversy over Metro's and the FTA's reliance
26  on questionable seismic studies, at no point before the eventual release of the FEIS
27  did the FTA provide an opportunity for public comment on these Seismic Studies,

28

23

AMENDED COMPLAINT

either by supplementing the DEIS or through a public hearing -- both of which were required under NEPA.

**E.     Release of the FEIS; Ongoing Controversy Regarding Seismic Studies**

77.     Without publishing for public review and comment the Seismic Studies on which Metro and the FTA were purportedly basing their NEPA decisions, or making available for public review and comment the significant (and growing) body of credible, independent scientific data raising serious concerns regarding the validity of those studies, the FTA released the FEIS on March 9, 2012.  The FEIS selected the Constellation Boulevard location for the Century City station.  The FEIS did not address the work being performed by BHUSD's and the City's consultants.  Moreover, the FEIS did not discuss in detail other important safety issues raised during the EIS process, including the presence of methane and hydrogen sulfide in the soil at the Constellation Boulevard location.

78.     The FEIS contained a great deal of previously unreleased information tending to show that the Project's environmental impacts will be significantly greater than originally contemplated in the DEIS.  This new information includes, but is not limited to, an altered construction schedule, a new location for the terminus of Phase I of the Project, and data related to air quality impacts, increased carbon dioxide emissions, and significant noise impacts.  The public was provided no opportunity for review of and comment on this significant new information, either through a SDEIS or through public hearings.

79.     In addition, unbeknownst to the public and without any opportunity for public comment, the FEIS adopted a new methodology for calculating ridership for the Century City station that was different from the methodology used in the DEIS.  Significantly, the new methodology was *only used for the Century City station*.  The new methodology was not used to calculate ridership at *any of the Project's other stations*.  This change in methodology, combined with the station

24

location shift described above, produced a radical change in ridership projections such that the ridership figures in the FEIS (in sharp contrast to those in the DEIS) weighed in favor of the Constellation Boulevard Alternative. Notwithstanding the fact that the New Starts Policies and Procedures required the FTA to review any changes to the methodologies and assumptions pertaining to the Project, including those pertaining to ridership patterns and revenue, there is no evidence in any FTA documents that the FTA reviewed the new methodology employed for calculating ridership at the Century City station.

80.    On March 23 and April 3, 2012, BHUSD requested that the FTA and Metro, respectively, extend the 30-day public comment period on the FEIS allowed under NEPA so that at least some of the vital seismic information contained in the post-DEIS seismic reports could be included in the public record. While Metro rejected this request, the FTA did grant a 30-day extension on April 6, 2012.

81.    Leighton released the first of three seismic reports on April 18, 2012. This report called into question all of the basic findings of the Seismic Studies on which the FEIS's selection of the Century City station alternative was based. Its key findings included: (1) the faults identified by Metro that allegedly cross both the BHHS Campus and the proposed Santa Monica Boulevard Alternative (West Beverly Hills Lineament faults) simply do not exist, (2) there are no active seismic faults in the areas around the BHHS Campus that were tested, and (3) the areas tested showed no surface disruption had taken place in at least 100,000 years (whereas under California law an "active fault" is defined as one which has broken the surface within the past 11,000 years). This directly contradicted the conclusion in the FEIS that the West Beverly Hills Lineament is an <u>active</u> earthquake fault – a conclusion that underpinned its decision that a subway station at Santa Monica Boulevard was not viable. Had Metro and the FTA conducted their seismic evaluations using appropriate methods, they would have reached this same conclusion. Based on this new information, BHUSD once again requested that the

AMENDED COMPLAINT

1    FTA postpone certification of the FEIS for a few weeks to allow for completion of

2    the Leighton seismic studies.  The FTA ignored this request.

3        82.    The FTA was aware that Metro's response to the Leighton Study was

4    insufficient.

5        **F.    Discussion of Tunneling Depths and Related Section 4(f) Analysis**

6            **in FEIS**

7        83.    The FEIS described a plan to lower the tunnel alignment depth from

8    that planned in the DEIS for areas that do not run under the public right of way.  In

9    some cases, the FEIS described depths increased by up to 50 feet.   Under the

10   Campus, the eastern end of the tunnel would be approximately 5 feet deeper, and

11   the western end of the tunnel would be approximately 15 feet lower.  Accordingly,

12   the center of the tunnel would remain approximately 50 feet deep under the

13   Campus.  There would be less than 50 feet between the top of the tunnel and the

14   ground surface.  It is widely recognized in the industry and within the FTA that a

15   separation of less than 50 feet between subway structure and building foundations

16   will result in vibrations and associated noise impacts.   Record evidence makes

17   plain that the depth described in the FEIS is woefully inadequate to protect BHHS

18   buildings, including those described in the Master Plan and buildings that are

19   recognized as historic.

20       84.    The FEIS concluded that BHHS is a protected historic property under

21   Section 4(f),[4] and considered BHHS in the study of public parks and recreation

22   areas.[5]   *See* FEIS at 5-1 to 5-41.   Despite evidence showing that, under the

---

[4] Final Environmental Impact Statement, March 2012, at 5-31.

[5] Publicly-owned property, including school playgrounds, may be recreational
facilities protected under Section 4(f) if they are open to the public and of local
significance for recreational purposes.  FHWA Section 4(f) Policy Paper (2005) at
19; *see also Piedmont Envtl. Council v. U.S. Dept. of Transp.*, 259 F. Supp. 2d 260
(W.D. Va. 2001), *aff'd in relevant part*, 58 Fed. Appx. 20 (4th Cir. 2003) (use of a
portion of a University of Virginia recreational facility for transportation project
(continued...)

AMENDED COMPLAINT

1  Constellation Boulevard Alternative, (1) construction activities would significantly
2  restrict access to and use of the Campus, (2) vibrations resulting from tunneling
3  would have a severe adverse impact on the ongoing use of the school as both an
4  historic resource and a recreational facility, and (3) tunneling under the school
5  would preclude BHUSD's long-standing, approved Master Plan for development
6  of BHHS, the FEIS concluded that tunneling under the Campus would result in "no
7  impairments" to the BHHS property.

8       85.    The unsubstantiated and conclusory statement in the FEIS's Section
9  4(f) analysis of impacts to BHHS is based only on a reference to the FHWA
10  Policy.   This discussion also neglects to acknowledge BHUSD's $334 million
11  Master Plan, of which the FTA and Metro were well aware.   Further, the record
12  demonstrates that the FTA failed to undertake the consultations required under
13  Section 4(f) regarding the impacts that the Constellation Boulevard Alternative
14  will have on the Campus.

15       86.    The FTA also failed to thoroughly and independently evaluate
16  whether constructing and operating a subway tunnel under the Campus would
17  directly or indirectly alter any of the Campus's characteristics that make the
18  Campus eligible for inclusion in the National Register of Historic Places.   36
19  C.F.R. § 800.5.

20  **G.      Certification of the FEIS and Post FEIS Information**

21       87.    On April 26, 2012, Metro approved Phase 1 of the Project and
22  certified the entire FEIS.

23       88.    The City requested a hearing ("PUC Hearing") by the Metro board
24  under California Public Utilities Code Section 30639.   At this hearing, held on

25

26  (continued)

27  constituted use of a Section 4(f) property).  The FEIS does not address whether
     BHHS is "of local significance for recreational purposes."

28

AMENDED COMPLAINT

May 17, 2012,[6] the City presented four hours of testimony by expert witnesses who expressed their concerns about the lack of adequate seismic testing at the Constellation Boulevard Alternative. Metro did not call a single witness or permit any of its experts to be cross-examined at the PUC Hearing, despite the fact that the statute expressly gave the City the right of cross-examination. Instead, Metro relied on the conclusions in its already-certified FEIS.

89.   The Metro Board met on May 24, 2012, and, ignoring the evidence brought to light regarding seismic concerns at the Constellation Boulevard Alternative, including the testimony provided at the PUC Hearing, adopted its Decision from the PUC Hearing to proceed with the Constellation Boulevard Alternative for the Century City station. On the same day, Metro approved all remaining phases of the Project and adopted a previously unreleased addendum to the FEIS containing substantial, material revisions to the FEIS.

90.   In multiple letters sent to the FTA following Metro's adoption of the FEIS, BHUSD urged the FTA to complete a SEIS prior to issuing an ROD. For example, on May 25, 2012, BHUSD requested that the FTA complete a SEIS and raised its objections to the addendum to the FEIS, which made significant changes to the FEIS without the opportunity for public review.

91.   On June 6, 2012 and June 27, 2012, BHUSD sent the FTA two additional reports: the May 21, 2012 California Geological Survey Report and the June 27, 2012 Preliminary Report by Kenney GeoScience, which both called into question the seismic studies upon which the FEIS relied. In light of these new

---

[6] While this hearing did feature testimony that cast doubt on the validity of Metro's seismic studies, this was not a NEPA hearing held for the purpose of involving the public in the review of seismic information associated with the environmental impacts review for the Project. Rather, this hearing was held at the request of the City, pursuant to California Public Utilities Code § 30639, which permits county or city officials to file a request for a hearing regarding "the reasonableness of any rates or charges fixed by the district and as to any proposal for fixing the location of facilities by the district."

AMENDED COMPLAINT

findings, BHUSD again encouraged the FTA to issue a SEIS to address the significant concerns raised in these post FEIS studies.

92.     BHUSD reiterated its request for a SEIS by letter dated July 2, 2012. Similarly, on July 23, 2012, BHUSD sent the FTA the July 18, 2012 Final Report by Kenney Geoscience, which contradicted Metro's assertion that there were active earthquake faults in Century City.  Accordingly, BHUSD requested that the FTA provide a PMOC to review the placement of the Century City subway station.

93.     Notwithstanding BHUSD's repeated requests that the FTA postpone the issuance of the ROD to evaluate the findings of the foregoing independent seismic studies, and to allow for the completion of additional independent analysis, the FTA ignored these requests and pushed forward  on an accelerated schedule.

94.     On August 23, 2012, the FTA announced its final agency action, including its Section 4(f) determinations and August 9, 2012 ROD for the Project. The FTA ROD includes a Memorandum of Understanding among the FTA, Metro, and the State Historic Preservation Officer that makes no provision for mitigating harm to the Campus, a property eligible for inclusion in the National Register of Historic Places.

## CLAIMS FOR RELIEF

### COUNT I

VIOLATIONS OF NEPA AND ITS IMPLEMENTING REGULATIONS

AND THE APA: FAILURE TO ADEQUATELY ASSESS AND DISCLOSE

ENVIRONMENTAL IMPACTS OF THE PROJECT AND ITS ALTERNATIVES

95.     Plaintiff hereby incorporates by reference and realleges each and every allegation of the Paragraphs above.

96.     Defendants violated NEPA and its implementing regulations, 40 C.F.R. Part 1500 and 23 C.F.R. Part 771, and the APA because they:

a)     Predetermined the location of the Century City subway station prior to performing the requisite "alternatives" analysis;

AMENDED COMPLAINT

b)     Failed to take the requisite "hard look" at the environmental impacts of the proposed Project and available alternatives, including significant seismic information bearing directly on the environmental and safety impacts of the Project;

c)     Included incomplete information regarding significant adverse impacts, despite the fact that the FTA was well aware that the studies needed to complete that information were not exorbitant, and were in fact, already underway;

d)     Failed to adequately address the Santa Monica Boulevard Alternative, as the FEIS does not include pertinent information relevant to this alternative and the comparison of the two alternative locations for the Century City station;

e)     Failed  to adequately account for the impact the Project will have on BHHS, including the preclusive effect it will have on BHUSD's ability to implement its Master Plan for development; and

f)     Pre-judged the outcome of the environmental impact review, as evidenced by the FTA's lack of independent evaluation of materials it accepted from Metro that evidenced a clear bias for the Constellation Boulevard location.

97.     Defendants acted arbitrarily and capriciously in approving the Project based on a factual record that contains both questionable data and gaping omissions.

98.     Such actions were arbitrary, capricious, and an abuse of discretion in violation of NEPA, its implementing regulations, and the APA.

**COUNT II**

VIOLATIONS OF NEPA AND ITS IMPLEMENTING REGULATIONS

AND THE APA: FAILURE TO SUPPLEMENT THE DEIS AND FEIS

99.     Plaintiff hereby incorporates by reference and realleges each and every allegation of the Paragraphs above.

100.    Defendants violated NEPA and its implementing regulations, 40 C.F.R. Part 1500 and 23 C.F.R. Part 771, and the APA, by arbitrarily and

AMENDED COMPLAINT

capriciously refusing to supplement the DEIS and FEIS for the Project despite substantial changes to the Project and in light of significant new information; specifically, Defendants:

a) Failed to release for public review and comment, either through a supplemental EIS or public hearings, additional significant new information, including a series of seismic studies, bearing on the environmental and safety impacts of the Project; and

b) Failed to supplement the FEIS despite repeated requests for supplementation and despite the fact that the FEIS contained incomplete information regarding foreseeable, significant adverse impacts of the selected alternative, even while the FTA had knowledge of in-progress studies that would complete this information.

101. Such actions were arbitrary, capricious, and an abuse of discretion in violation of NEPA, its implementing regulations, and the APA.

## COUNT III

### VIOLATIONS OF SECTION 4(f) AND THE APA

102. Plaintiff hereby incorporates by reference and realleges each and every allegation of the Paragraphs above.

103. Defendants violated Section 4(f) and the APA through their determination that the Constellation Boulevard Alternative will not "use" BHHS, a protected recreational and historic property, which was arbitrary, capricious, and not in accordance with law, because:

a) Construction and operation of the Constellation Boulevard Alternative will result in the permanent incorporation of BHHS into the transportation facility, with ongoing noise and vibration impacts and a preclusive effect on long-planned development that would (1) substantially impair its value as a Section 4(f) historic site, and (2) have a permanent and adverse impact on its locally significant public recreational purposes;

31

b)      Assuming, *arguendo*, that BHHS would not be permanently incorporated into the transportation facility under the Constellation Boulevard Alternative, the activity required to construct the relevant portion of the Project, including severely limited access to, and severe disruption of the day-to-day use of, the Campus as both an historical and recreational resource for students and the public alike, does not meet the criteria specified in 23 C.F.R. § 774.13(d) for permissible temporary use of a property; and

c)      Even assuming, *arguendo*, that the Constellation Boulevard Alternative would not permanently incorporate BHHS into the transportation facility nor temporarily use the property in such a way as to trigger Section 4(f), the substantial diminishment of the utility of BHHS as both an historic and recreational property resulting from the Project's devastating impact on the Master Plan, as well as significant and ongoing vibration impacts, rise to the level of a "constructive use" within the meaning of Section 4(f).

104.   Such determinations were arbitrary, capricious, and an abuse of discretion in violation of Section 4(f) and the APA.

### COUNT IV

VIOLATIONS OF SECTION 106 AND THE APA

86.    Plaintiff hereby incorporates by reference and realleges each and every allegation of the Paragraphs above.

87.    Defendants violated Section 106 and the APA when they determined that the Campus would not be affected by the construction of a subway tunnel beneath the Campus, because:

(a)  The construction activities will cause noise and vibrations that will affect the historic buildings and diminish the integrity and feeling of the Campus; and;

32

AMENDED COMPLAINT

(b)  The operation of a subway tunnel beneath the Campus would cause noise and vibrations that would introduce atmospheric and audible elements that diminish the integrity of the property's significant historic features.

88.  Such determination was arbitrary, capricious, and an abuse of discretion in violation of Section 106 and the APA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests this Court grant the following relief:

A.  Declare that Defendants violated NEPA, Section 4(f), Section 106, and the APA by issuing the ROD approving the FEIS;

B.  Issue an injunction requiring that Defendants fully comply with the provisions of NEPA (including but not limited to preparation of a SEIS), Section 4(f), Section 106, and their implementing regulations, and specifically to ensure that Defendants take no further actions toward proceeding with the Westside Subway Extension Project until they have fully complied with those laws;

C.  Issue an injunction prohibiting the FTA from obligating TIFIA funds to the Project until FTA has fully complied with the provisions of NEPA;

D.  Declare that the FEIS is invalid;

E.  Order that the Record of Decision dated August 9, 2012 be vacated, set aside, and/or rescinded;

Dated:  November 21, 2013

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

By: _____

Linda D. Kornfeld
William M. Goodman
Clarine Nardi Riddle
Aaron H. Marks
Jennifer S. Recine

Attorneys for Plaintiff Beverly Hills Unified School District

33

AMENDED COMPLAINT

1

2

**PROOF OF SERVICE**

3   I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 2029 Century Park East, Suite 750, Los Angeles, CA 90067.

4

5   On November 21, 2013, I served, in the manner indicated below, the foregoing documents described as **Amended Complaint for Declaratory and Injunctive Relief** on the interested parties in this action by placing true copies thereof, enclosed in sealed envelopes, at Los Angeles, addressed as follows:

6

7   Jared S. Pettinato

8   United States Department of Justice
   Environment and Natural Resources Division

9   Natural Resources Section
   P.O. Box 7611, Room 2121

10   Washington, D.C. 20044

11   ___ **BY REGULAR MAIL**: I caused such envelopes to be deposited in the United States mail at

12   Los Angeles California, with postage thereon fully prepaid. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the United

13   States Postal Service each day and that practice was followed in the ordinary course of business for the service herein attested to (C.C.P. § 1013(a)).

14

15   ___ **BY FACSIMILE**: (C.C.P. § 1013(e)(f)) by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

16

17   ___ **BY OVERNIGHT DELIVERY**: I caused such envelopes to be delivered by courier, with next day service, to the offices of the addressees. (C.C.P. § 1013(c)(d)).

18

19   ___ **BY PERSONAL SERVICE**: I caused such envelopes to be delivered by hand to the offices of the addressees. (C.C.P. § 1011(a)(b)).

20   _XX__ **BY ELECTRONIC MAIL**: I caused such document(s) to be delivered electronically to the

21   following email address(es):

22   **Jared S. Pettinato**
   **Jared.Pettinato@usdoj.gov**

23

24   I declare under penalty of perjury under the laws of the United State of America that the above is true and correct.

25

26   Executed on November 21, 2013, at Los Angeles, California.

27

28   Donna Boss

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW