ROBERT S. PERLMUTTER (State Bar No. 183333)
perlmutter@smwlaw.com
SARA A. CLARK (State Bar No. 273600)
clark@smwlaw.com
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, CA 94102
Tel:   (415) 552-7272
Fax:   (415) 552-5816

DONALD L. SAMUELS (State Bar No. 126287)
donald.samuels@bryancave.com
BRYAN CAVE LLP
120 Broadway, Suite 300
Santa Monica, CA 90401-2386
Tel:   (310) 576-2100
Fax:   (310) 576-2200

Attorneys for Plaintiff
THE CITY OF BEVERLY HILLS,
a municipal corporation

*(Additional counsel on next page)*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BEVERLY HILLS UNIFIED SCHOOL DISTRICT,<br><br>        Plaintiff,<br><br>    v.<br><br>FEDERAL TRANSIT ADMINISTRATION, et al.,<br><br>        Defendants. | Case No. CV 12-9861-GW (SSx)<br>*Consolidated with*<br>Nos. CV 13-1144-GW (SSx)<br>     CV 13-8609-GW (SSx)<br>     CV 13-8621-GW (SSx)<br><br>**THE CITY OF BEVERLY HILLS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:    December 4, 2014<br>Time:   8:30 a.m.<br>Courtroom:    10 |
| THE CITY OF BEVERLY HILLS, a municipal corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>FEDERAL TRANSIT ADMINISTRATION, et al.,<br><br>        Defendants. | |

PHILIP E. KARMEL (admitted pro hac vice)
*pekarmel@bryancave.com*
BRYAN CAVE LLP
1290 Avenue of Americas
New York, NY 10104-3300
Tel:    (212) 541-2311
Fax:    (212) 541-1413

Additional Attorneys for Plaintiff
THE CITY OF BEVERLY HILLS,
a municipal corporation

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    I.     The Westside (Purple Line) Subway and Its Complex Environmental Setting ... 3

    II.    The Project's Environmental Review ....................................................... 4

        A.    Release of the Draft EIS ................................................................. 4

        B.    The Switch in Century City Stations ............................................. 5

        C.    The Final EIS .................................................................................. 6

    III.   Procedural History of Litigation ........................................................... 7

STANDARD OF REVIEW ...................................................................................... 7

ARGUMENT ............................................................................................................ 8

    I.     FTA Violated NEPA in Approving the Project. ..................................... 8

        A.    FTA Failed to Take a Hard Look at Local Air Quality and Public Health Impacts. ........................................................................ 8

            1.    FTA Failed to Conduct Any Analysis of Localized Air Pollution Impacts from Construction. ........................................... 9

            2.    FTA Failed to Assess Public Health Impacts from Construction Emissions. ........................................................ 12

            3.    FTA's Failure to Analyze Local Air Quality Impacts from Construction Precluded an Adequate Discussion of Mitigation. ............. 12

        B.    The FEIS Failed to Disclose the Potential Environmental Impacts of the Project's Catastrophic Risks ........................................ 13

            1.    FTA Ignored Potentially Catastrophic Risks Associated with Tunneling Through Pockets of Explosive Gases. ................. 16

               a.    FTA Failed to Take the Required Hard Look at the Potential for Tunneling to Force Methane Gas to the Surface. ............... 16

               b.    FTA Failed to Disclose Contrary Scientific Opinion Contained in Its Own Administrative Record. ........................ 18

            2.    FTA's Handling of Incomplete Information about the Risks Posed by Unknown Oil Wells Violates NEPA ......................... 19

            3.    The EIS's Incomplete Information about the WBHL Precludes a Reasoned Choice among Alternatives. ............................... 21

i

C.    FTA's Failure to Examine Alternate Routes to Constellation Violated NEPA................................................................................................24

    1.    The EIS Contains No Analysis of Any Alternative Route to Constellation that Would Avoid Tunneling under BHHS. .....................25

    2.    FTA Failed to Independently Evaluate or Consider Alternatives Proposed by the City. ................................................................26

    3.    FTA's Actions Deprived Agency Decisionmakers of Information Necessary to Make an Informed Choice. ................................28

II.    FTA Violated Section 4(f) of the Department of Transportation Act by Failing to Adequately Protect Park and Recreation Resources.........................29

    A.    FTA's Section 4(f) Analysis Failed To Assess Whether the Project Would "Use" Reeves Park and Failed to Evaluate Whether Such Use Could be Avoided or Its Attendant Harms Minimized..................................................30

    B.    FTA Improperly Determined that BHHS's Recreational and Athletic Facilities are not Protected by Section 4(f) and Thus Failed to Undertake Any of the Required Analysis to Avoid Unlawfully Using Them...............33

III.    FTA's Clean Air Act Conformity Determination Was Arbitrary and Capricious. ...........................................................................................35

IV.    FTA Violated NEPA by Refusing to Re-Open the NEPA Process to Assess New Information Contradicting the FEIS's Assumptions regarding the Relative Risks of the Century City Station Options...........................................36

CONCLUSION .............................................................................................40

Glossary of Abbreviated Terms ...................................................................vii

THE CITY OF BEVERLY HILLS' MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 12-9861-GW (SSX)

# TABLE OF AUTHORITIES

## Federal Cases

*Adler v. Lewis*
  675 F.2d 1085 (9th Cir. 1982) .......................................................... 7, 29, 31

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*
  67 F.3d 723 (9th Cir. 1995) .................................................. 24, 26, 37, 39

*Alliance for Wild Rockies v. Bradford*
  720 F.Supp.2d 1193 (D. Mont. 2010) ............................................... 23

*Auer v. Robbins*
  519 U.S. 452 (1997) ............................................................................ 35

*Brooks v. Volpe*
  460 F.2d 1193 (9th Cir. 1972) ........................................................... 31

*Citizens Against Toxic Sprays, Inc. v. Bergland*
  428 F.Supp. 908 (D. Or. 1977) .......................................................... 12

*Citizens for Mass Transit Against Freeways v. Brinegar*
  357 F.Supp. 1269 (D. Ariz. 1973) ..................................................... 31

*Citizens to Pres. Overton Park v. Volpe*
  401 U.S. 402 (1971) ........................................................................ 7, 29

*City of S. Pasadena v. Slater*
  56 F.Supp.2d 1106 (C.D. Cal. 1999) ................................................ 33

*City of Sausalito v. O'Neill*
  386 F.3d 1186 (9th Cir. 2004) ............................................................. 7

*City of Tenakee Springs v. Clough*
  915 F.2d 1308 (9th Cir. 1990) ........................................................... 28

*Coal. for Canyon Pres. v. Bowers*
  632 F.2d 774 (9th Cir. 1980) ............................................................. 26

*Coal. for Responsible Regional Dev. v. Coleman*
  430 F.Supp. 13 (S.D. W.Va. 1976), *aff'd* 555 F.2d 398 (4th Cir. 1977) ............... 10, 33

*Coliseum Square Ass'n, Inc. v. Jackson*
  465 F.3d 215 (5th Cir. 2006) ............................................................. 24

*Conserv. Law Fndn v. Busey*
  79 F.3d 1250 (1st Cir. 1996) ............................................................... 7

*Ctr. for Biological Diversity v. BLM*
  422 F.Supp.2d 1115 (N.D. Cal. 2006) ............................................. 18

*Ctr. for Biological Diversity v. USFS*
  349 F.3d 1157 (9th Cir. 2003) ........................................................... 19

*Dubois v. U.S. Dep't of Agric.*
   102 F.3d 1273 (1st Cir. 1996) ..........................................................27, 39

*Friends of Bitterroot, Inc. v. U.S. Forest Serv.*
   900 F.Supp. 1368 (D. Mont. 1994) ...........................................................26

*Greater Yellowstone Coalition v. Lewis*
   628 F.3d 1143 (9th Cir. 2010) ..................................................................20

*'Ilio'ulaokalani Coal. v. Rumsfeld*
   464 F.3d 1083 (9th Cir. 2006) ............................................................26, 28

*Lands Council v. Powell*
   395 F.3d 1019 (9th Cir. 2005) ..................................................................24

*League of Wilderness Defenders v. Connaughton*
   Case No. 13-35653, 2014 WL 1814172 (9th Cir. May 8, 2014) ...........37, 39, 40

*Marsh v. Or. Natural Res. Council*
   490 U.S. 360 (1989) ..................................................................................13

*Massachusetts v. Watt*
   716 F.2d 946 (1st Cir. 1983) ...............................................................38, 39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
   463 U.S. 29 (1983) ................................................................................7, 17

*Nat'l Parks & Conservation Ass'n v. FAA*
   998 F.2d 1523 (10th Cir. 1993) ......................................................32, 33, 35

*Native Ecosystems Council v. USFS*
   418 F.3d 953 (9th Cir. 2005) ......................................................................7

*Native Vill. of Point Hope v. Salazar*
   730 F.Supp.2d 1009 (D. Alaska 2010) ...............................................18, 21

*Nevada v. DOE*
   457 F.3d 78 (D.C. Cir. 2006) .......................................................................8

*NRDC v. USFS*
   421 F.3d 797 (9th Cir. 2005) ...................................................................26

*Or. Natural Desert Ass'n v. BLM*
   625 F.3d 1092 (9th Cir. 2010) ...........................................................7, 26, 39

*Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*
   482 F.Supp.2d 1248 (W.D. Wash. 2007) ...........................................15, 19

*Robertson v. Methow Valley Citizens Council*
   490 U.S. 332 (1989) ............................................................................8, 14

*San Luis Obispo Mothers for Peace v. NRC*
   449 F.3d 1016 (9th Cir. 2006) .........................................................14, 17, 21

iv

*Sierra Club v. Bosworth*
   199 F.Supp.2d 971 (N.D. Cal. 2002) ............................................................. 19

*Sierra Club v. DOT*
   962 F.Supp. 1037 (N.D. Ill. 1997) ................................................................ 18

*Sierra Club v. U.S. Army Corps of Engineers*
   701 F.2d 1011 (2d Cir. 1983) ....................................................................... 17

*Silva v. Lynn*
   482 F.2d 1282 (1st Cir. 1973) ...................................................................... 13

*Southeast Alaska Conservation Council v. FHWA*
   649 F.3d 1050, 1053 (9th Cir. 2011) ........................................................... 25

*State of Cal. v. Block*
   690 F.2d 753 (9th Cir. 1982) ................................................................. 28, 29

*Stewart Park & Reserve Coal., Inc. v. Slater*
   352 F.3d 545 (2d Cir. 2003) ......................................................................... 33

*Stop H-3 Ass'n v. Coleman*
   533 F.2d 434 (9th Cir. 1976) .................................................................. 31, 32

*Today's IV, Inc. v. FTA,*
   at *24 (Case No. 2:13-cv-00453-JAK-PLA) ................................................ 26

*Utahns for Better Transp. v. DOT*
   305 F.3d 1152 (10th Cir. 2002) ................................................................... 27

*W. Land Exch. Project v. BLM*
   315 F.Supp.2d 1068 (D. Nev. 2004) ............................................................ 27

*W. Watersheds Project v. Abbey*
   719 F.3d 1035 (9th Cir. 2013) ..................................................................... 26

## Federal Statutes

5 U.S.C.
   § 706(2)(A) ..................................................................................................... 7

23 U.S.C.
   § 139(c)(3) ..................................................................................................... 27

42 U.S.C.
   § 4331 ............................................................................................................ 12
   § 4332 ..................................................................................................... 25, 26
   § 7409(b)(1) .................................................................................................... 9
   § 7506(c)(1) ................................................................................................... 35

49 U.S.C.
   § 303(c) ................................................................................................... 29, 30

v

Federal Rules of Evidence

Fed. Rule Evid. 1006 ................................................................ 23

## Federal Regulations

Code of Federal Regulations

23 C.F.R. § 771.109 ................................................................ 27
23 C.F.R. § 771.130 ................................................................ 37
23 C.F.R. § 774.3 .................................................................... 30
23 C.F.R. § 774.11 .................................................................. 34
23 C.F.R. § 774.13 .................................................................. 34
23 C.F.R. § 774.15 ............................................................. 29, 32
23 C.F.R. § 774.17 ............................................................. 33, 34
40 C.F.R. pt. 51, Appendix W .................................................. 9
40 C.F.R. pt. 89 ..................................................................... 13
40 C.F.R. pt. 1039 .................................................................. 13
40 C.F.R. § 50.6 ..................................................................... 10
40 C.F.R. § 1502.9 ........................................................ 15, 19, 37
40 C.F.R. § 1502.14 ................................................. 15, 18, 20, 24, 27
40 C.F.R. § 1502.22 .............................................................. 20-21
40 C.F.R. § 1502.24 ................................................................ 12
40 C.F.R. § 1508.27 ................................................................ 12

Federal Register

56 Fed. Reg. 13269, 13270 (Apr. 1, 1991) ................................ 32

THE CITY OF BEVERLY HILLS' MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 12-9861-GW (SSX)

**Glossary of Abbreviated Terms**

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| BHHS | Beverly Hills High School |
| BHUSD | Beverly Hills Unified School District |
| CGS | California Geological Survey |
| City | City of Beverly Hills |
| Constellation Station | Proposed subway station located at Constellation Boulevard and Avenue of the Stars |
| DEIS | Draft Environmental Impact Statement/Environmental Impact Report |
| DOT | Department of Transportation |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement/Environmental Impact Report |
| FEIS | Final Environmental Impact Statement/Environmental Impact Report |
| FTA | Federal Transit Administration |
| FTAAR | Federal Transit Administration Administrative Record |
| Metro | Los Angeles County Metropolitan Transportation Authority |
| NAAQS | National Ambient Air Quality Standards |
| $NO_x$ | Nitrogen oxides |
| NRC | Nuclear Regulatory Commission |
| $PM_{2.5}$ | Fine particulate matter |
| $PM_{10}$ | Coarse particulate matter |
| Project | Westside Subway Extension Project |
| ROD | Record of Decision |
| SAR | Supplemental Administrative Record |
| Santa Monica East Station | Proposed subway station located at Santa Monica Boulevard and Century City East |
| Section 4(f) | Section 4(f) of the Department of Transportation Act of 1966, *codified at* 49 U.S.C. § 303 and 23 U.S.C. §138 |
| Sectin 4(f) Report | Section 4(f) Evaluation Technical Report |
| SCAQMD | South Coast Air Quality Management District |
| SEIS | Supplemental Environmental Impact Statement |
| TMP | Travel Management Plan |
| WBHL | West Beverly Hills Lineament |

THE CITY OF BEVERLY HILLS' MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 12-9861-GW (SSX)

# INTRODUCTION

The City of Beverly Hills challenges the Federal Transit Administration's final determinations under three federal statutes that apply to FTA's funding of the Westside Subway Extension Project.  The Project would extend the Los Angeles County Metropolitan Transportation Authority (Metro) purple line for nine miles across the westside of Los Angeles and Beverly Hills. FTA and Metro (collectively, the "Agencies") nominally served as joint "lead agencies" for the Project under the National Environmental Policy Act (NEPA). In practice, however, Metro drafted all substantive documents—including FTA's formal Record of Decision under NEPA—conducted all public outreach, and drove the accelerated timeline, even when FTA staff intermittently expressed concern that the process was being rushed and required analyses that had not been performed.

The westside's environmental setting presents an unusually complex set of challenges for subway construction because it is riddled with seismic features, high concentrations of methane and other explosive gases, and known and unknown oil wells. Metro has never constructed a subway through such a complicated environment. And it has rarely undertaken such lengthy construction work in such a heavily urbanized area, where over 100,000 diesel trucks will emit high levels of air pollution into the most heavily populated areas of Beverly Hills for nearly a decade. Yet rather than independently evaluate the potential hazards associated with the Project and ensure that the Environmental Impact Statement (EIS) complied with the requirements of the applicable federal statutes, FTA repeatedly deferred to Metro's inadequate work in an effort to accommodate an accelerated review of the Project.

By approving the resultant flawed analysis, FTA violated the law in four ways. First, FTA violated NEPA, which mandates that all federal agencies take a "hard look" at the potential environmental consequences of their actions. Notwithstanding the massive record the Agencies have compiled for this Court, FTA failed to take the required "hard look"—or, indeed, any look—at several critically important environmental issues. Perhaps most disturbingly, the EIS failed to include *any* analysis of the Project's local air quality and public health impacts, in direct contravention of the guidance provided by the U.S. EPA, the

1

regional air quality management district, and Metro's own consultants. As a result, neither FTA nor the public were informed of the Project's most serious adverse air quality and public health impacts—diesel emissions and dust concentrated near schools, childcare facilities, and other sensitive receptors—or of possible mitigation measures to reduce such impacts, such as requiring the use of cleaner engine technology or moving construction staging areas away from sensitive locations. The EIS also failed to take a hard look at the environmental consequences of several potentially catastrophic risks associated with constructing a subway through such a uniquely complex setting. NEPA contains specific provisions for addressing such low probability but high risk events, and the Ninth Circuit has emphasized the importance of these provisions to ensure that agency decisionmakers make a fully informed choice from amongst the options before them.

Second, FTA violated Section 4(f) of the Department of Transportation Act of 1966, which prohibits FTA from approving projects that will "use" public park and recreation facilities unless there is no "prudent and feasible" alternative to doing so. FTA staff initially expressed grave concern that the Metro consultants preparing the Section 4(f) analysis had fundamentally misunderstood federal requirements and improperly determined that the Project would not "use" a nearby City-owned park (Reeves Park). However, as the record reflects, these concerns were never addressed in the final approval documents and instead were simply brushed aside in the Agencies' haste to approve the Project. As a result, FTA violated Section 4(f) by approving the Project without undertaking the required analysis as to the "use" of Reeves Park and without analyzing the use of athletic facilities at Beverly Hills High School (BHHS) and whether there are alternatives to using these Section 4(f) resources.

FTA took a similarly cavalier approach to the Clean Air Act's "conformity" requirements, failing to undertake the required analysis to determine whether the prolonged, concentrated, and extensive construction work for the Project would cause violations of the applicable air quality standards. Instead, FTA's analysis focused exclusively on whether the *operation* of the Project—once built—would cause any such violations. While FTA unsurprisingly concluded that operation of this mass transit project would provide a slight air

2

quality benefit, it never addressed the actual issue of concern: the impact of the Project's lengthy **construction** on air quality standards in the local areas near the construction sites.

Finally, FTA violated NEPA by refusing to re-open the NEPA process to assess the flurry of additional reports—including critical analyses by the California Geological Survey—which showed that the fundamental assumptions behind the Agencies' switch in the preferred location of the most controversial subway station were factually unfounded.

Accordingly, and for the reasons set for in the brief of the Beverly Hills Unified School District (BHUSD), which the City joins, this Court should set aside FTA's approvals. The Court should require FTA to fully address the Project's important health, safety, and environmental impacts in compliance with federal law prior to re-issuing any approvals.

## STATEMENT OF FACTS

## I.    The Westside (Purple Line) Subway and Its Complex Environmental Setting

The Project would extend Metro's purple line by adding subway service across west Los Angeles. From the line's existing terminus, seven new stations would be added, including two within Beverly Hills. AR[1] 246-50, 514 (Project map). Depending upon funding, the Project may be built in three phases over 23 years, or concurrently over 10 years. AR727-34.

The Project requires Metro to construct twin subway tunnels in complicated above- and below-ground settings. The route passes through heavily urbanized areas of Los Angeles and Beverly Hills. AR517-22, 609. The above-ground construction—slated to last seven years at each of the seven new stations (AR1186)—will cause significant noise and air pollution. It will exacerbate traffic congestion, adversely affect local businesses and city tax revenue, and worsen the quality of life for area residents. AR537, 621, 35327-74. The below-ground setting is even more complex. Nearly the entire Project will traverse designated "methane zones." AR1037. Tunneling in such areas is inherently dangerous, as methane and

---

[1]  The administrative record consists of Metro's initial record (AR), FTA's additional documents (FTAAR) and Metro's supplemental record (SAR). ECF Nos. 24, 90.

hydrogen sulfide gases can cause devastating explosions. Active and abandoned oil wells—many of which are not mapped or properly capped—dot the Project's route, including directly underneath BHHS. AR1035, 31276-78. According to the Agencies, the route will also cross multiple active earthquake fault zones. AR37123-25, 37100, 37115.

In 1985, a Ross "Dress for Less" store spontaneously exploded on the westside. AR55400, 64098, 53249-604. A task force investigation revealed that below-surface gas pockets had forced "almost pure methane" into the building. AR54564-65. The pockets originated from decomposing organic matter or an abandoned oil well. AR54564-65. The task force also identified methane gas risk zones across the westside. AR55400. As a result, Congress banned federal funding for any tunneling project within the methane zone, effectively halting a westside subway. AR38164, 23921.

## II.    The Project's Environmental Review

Metro and its predecessor have long sought a westside subway line. The route for the westside subway proposed in 1968, for example, followed a path similar to the Project challenged here, but to avoid tunneling under BHHS and residential properties, sited the Century City station on Santa Monica Blvd. (hereinafter, Santa Monica Station). AR53565, 53594, SAR3259. Following Congress's repeal of its funding ban in 2007, the Agencies prepared an Alternatives Analysis to re-evaluate westside transit options. AR523, 19343. Most of the potential subway routes included the long-planned Santa Monica Station. AR24158-81. None of the routes indicated a preference for a station at Constellation Blvd.

### A.    Release of the Draft EIS

As the Agencies began preparing a draft EIS (DEIS) for the Project in 2009, they retained the Santa Monica Station. However—as detailed in the City's Statement of Uncontroverted Facts and contrary to what the Agencies were telling the public—Metro staff began promoting an alternate station on Constellation Blvd. to FTA. Nevertheless, the document made available to the public for comment—the September 2010 DEIS—identified the Santa Monica Station as the "base" station for Century City. AR19451. The DEIS also indicated that a Constellation Station was possible. AR19368-69.

Metro designated its Locally Preferred Alternative on October 28, 2010, retaining the Santa Monica Station as a primary option. AR23174-75. In response to the City's concerns about a potential shift of the station to Constellation Blvd., Metro's Board passed a motion requiring that "staff fully explore the risks associated with tunneling under [BHHS]." AR23176. The Board ordered staff to provide information to the City "as soon as [it] become[s] available," and to "analyze the possibility of moving the subway tunnel in order to avoid all school buildings and avoid impacting any future plans…." *Id.*

Despite these directives, neither FTA nor Metro apprised the City of their thinking or internal research. By February 2011, Metro staff had shifted the location of the station further east along Santa Monica Blvd. (Santa Monica East Station), ostensibly due to seismic concerns. AR39443-45. Yet the Agencies never directly informed the City or the public of that concern. Answer ¶ 51.

Behind the scenes, FTA also began to question whether it could rely on Metro to prepare environmental documents that complied with federal law. After months of frustration, FTA finally took over responsibility for consultation to facilitate compliance with the National Historic Preservation Act. *E.g.*, FTAAR33924, 32480. In other areas, FTA raised concerns and frustrations, but never exercised any meaningful control or oversight over Metro's shoddy work. For instance, FTA staff raised concerns that Metro's documents had failed to consider construction impacts to the City-owned Reeves Park. AR33936, 32359. Instead of fixing the problems, FTA acquiesced to the removal of any analysis about the park in the Final EIS. FTAAR3302-03; AR6079.

## B.    The Switch in Century City Stations

Shortly before releasing the Final FEIS (FEIS), Metro revealed that it would likely switch its route to Constellation Blvd., allegedly due to newly obtained seismic information. AR37127. This information came via two new reports obviously long in preparation: the Century City Area Fault Investigation Report (AR37090-171) and Century City Tunneling Safety Report (AR38124-255). These reports claimed to discover a wholly new active fault zone, the West Beverly Hills Lineament (WBHL). According to Metro, this discovery

5

1  precluded construction of *any* station along Santa Monica Blvd. AR37101. The reports also

2  placed BHHS and nearby residences squarely within a zone of active faulting.

3      In response, both the City and BHUSD sought expert analyses to evaluate Metro's

4  eleventh-hour assertions about faulting and the safety of tunneling beneath BHHS. These

5  expert reports strongly questioned the comprehensiveness and accuracy of Metro's analysis,

6  which focused on one potential hazard but ignored others. For example, Exponent's Hazard

7  Assessment Study revealed that the Agencies had done little to address the potential that

8  tunneling activities would release hazardous gas to the ground surface. AR31259-328.

9  Exponent also noted that the Agencies had failed to consider the ramifications of capping

10  wildcat oil wells at BHHS, which could include damage to buildings through subsidence or

11  additional above-ground construction. AR38538, 38541-42. BHUSD, whose experts were

12  conducting extensive below-ground investigations under the supervision of the California

13  Geological Survey (CGS), pleaded with the Agencies to wait for its results. SAR1188-93.

14      FTA, on the other hand, was under pressure to finish. After months of battling with

15  Metro over deadlines, sloppy drafting, and inadequate analysis prepared by Metro's

16  consultants, FTA staff was, in the words of a key FTA team member, "trying very hard to

17  ignore mistakes so this review process [could] be over with." FTAAR33891.

18      **C.**    **The Final EIS**

19      In their rush to obtain Project approval, the Agencies refused to engage in any

20  dialogue about the various experts' diametrically opposed conclusions. Instead, they released

21  the FEIS on March 23, 2012. FTAAR28730. The FEIS recommended locating the Century

22  City station at Constellation, rather than at the long-planned Santa Monica Blvd. location.

23  AR519-20. The Agencies' unwillingness to await more complete seismic information left

24  many observers scratching their heads. *See, e.g.*, AR23835 (Metro Director Antonovich

25  questioning the Board's "rush to judgment instead of [taking the] time to deliberate and get

26  [relevant] information"), 33963-64 (Congressman Waxman urging Metro to "weigh[]

27  carefully" the City and BHUSD reports prior to making a decision).

28      FTA continued to let Metro control the process, even allowing Metro to prepare the

6

1    official Record of Decision (ROD) for *FTA's approval*. FTAAR28614. On August 9, 2012,

2    FTA approved the Project route, including the Metro-prepared ROD. FTAAR30-46.

3    **III.    Procedural History of Litigation**

4         The City filed suit on February 15, 2013. The case was consolidated with similar

5    litigation brought by BHUSD, and later with two additional complaints filed by the City and

6    BHUSD concerning FTA's refusal to prepare a supplemental EIS.[2]

7                            **STANDARD OF REVIEW**

8         The Administrative Procedure Act (APA) authorizes judicial review of the City's

9    claims. *Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1109 (9th Cir. 2010); *Adler v.

10   Lewis*, 675 F.2d 1085, 1091 (9th Cir. 1982); *Conserv. Law Fndn v. Busey*, 79 F.3d 1250,

11   1260-62 (1st Cir. 1996). Under the APA, an agency decision shall be set aside if it is

12   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

13   U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the agency has "entirely

14   failed to consider an important aspect of the problem, offered an explanation for its decision

15   that runs counter to the evidence before the agency, or is so implausible that it could not be

16   ascribed to a difference in view." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.

17   Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court must conduct a "thorough, probing, in-

18   depth review" of agency decision-making. *Citizens to Pres. Overton Park v. Volpe*, 401 U.S.

19   402, 415 (1971), *abrogated on other grounds*. The court must also determine whether the

20   agency has presented a rational connection between the facts found and the conclusions

21   made. *Native Ecosystems Council v. USFS*, 418 F.3d 953, 960 (9th Cir. 2005).

22        NEPA requires that "the agency, in reaching its decision, will have available, and will

23   _____

24   [2] The City has standing because the Project would negatively impact it by increasing traffic
     congestion; degrading air quality; increasing noise; hindering emergency services;
25   decreasing City revenue; increasing the need for street cleaning; increasing the demand for
     road maintenance; and harming City parks and recreational facilities. *See, e.g.*, *City of
26   Sausalito v. O'Neill*, 386 F.3d 1186, 1198 (9th Cir. 2004) (city has standing to challenge
     federal action where project will impact city infrastructure and ability to provide public
27   safety services); *see also* Kolin Decl ¶¶ 20-22.

28

                                            7

carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The statute demands that agencies take a "'hard look' at environmental consequences." *Id.* at 350. The court must confirm "that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Nevada v. DOE*, 457 F.3d 78, 87-88 (D.C. Cir. 2006).

**ARGUMENT**

**I.     FTA Violated NEPA in Approving the Project.**

    **A.     FTA Failed to Take a Hard Look at Local Air Quality and Public Health Impacts.**

The proposed Subway is a mammoth construction project. Hundreds of thousands of cubic yards of soil will be excavated from Beverly Hills, with the soil hauled away by diesel trucks making more than 100,000 trips in and around the City. The proposed epicenter of this activity is Constellation Station and its staging areas, one of which is located adjacent to BHHS and all of which are in close proximity to BHHS. AR16087-88, 16132, 16152, 1720, 1724-25. Tens of thousands of concrete and haul truck trips will be necessary to build this station and to remove the spoils excavated from 2.5 miles of tunnels constructed beneath the City. AR1181, 16080. Constructing the Rodeo, La Cienega, and Fairfax Stations will bring the total number of truck trips to over 100,000. *See* AR1703-04. These activities will cause "major traffic disruptions and bottlenecks." AR749. Construction activities at certain locations, including the one near BHHS, will last seven years. AR1186. Prolonged construction activities will also occur adjacent to residences, day care centers, and health care facilities for the elderly. AR5095-96.

An obvious issue of critical environmental significance for this Project is whether the dust released into the air by these massive, prolonged, and concentrated excavation activities, combined with diesel emissions from trucks and other construction equipment, will result in adverse impacts to local air quality, thereby causing adverse effects on public health. As explained below, FTA did not undertake ***any*** analysis of potential impacts to local air quality

8

or public health, much less the "hard look" required by NEPA.

### 1.   FTA Failed to Conduct Any Analysis of Localized Air Pollution Impacts from Construction.

The FEIS's construction air quality analysis—as supplemented by a post-FEIS Addendum—is only a few pages long. Its bare-bones analysis can be summarized easily: construction activities will emit hundreds of pounds of air pollution per day at each station location. AR1200, 19307. The data are broken down by pollutant and by the type of excavation site. Locations at which tunneling spoils are excavated (such as Constellation Station, near BHHS) will have higher emission rates than station locations that do not involve such excavation. So, for example, the Addendum discloses that at tunnel spoils removal sites, emissions of coarse particulate matter ($PM_{10}$) will be 140 pounds per day, emissions of fine particulate matter ($PM_{2.5}$) will be 33 pounds per day, and emissions of nitrogen oxides ($NO_x$) will be 196 pounds per day. AR19307.

Thus, information concerning the Project's ***gross air pollutant load*** at specific locations was disclosed. But those raw data shed no light on the potential air quality or public health impacts of these emissions on local residents. What is missing is the next step in the analysis: converting the anticipated gross Project emissions into air pollution concentrations in the affected area, and comparing those concentrations to some health-related benchmark.

The standard technique for taking this second essential step in a NEPA air impacts analysis is to perform "dispersion modeling" to translate "pounds per day" emission estimates to concentration levels in the air at specific locations that can then be compared to EPA's National Ambient Air Quality Standards (NAAQS). *See, e.g.*, EPA, *Reflecting the Revised $PM_{2.5}$ National Ambient Air Quality Standard in NEPA Evaluations* (June 25, 2007);[3] EPA's Guideline on Air Quality Models (40 C.F.R. Part 51, Appendix W). The NAAQS are set at levels "requisite to protect public health," 42 U.S.C. § 7409(b)(1), and are

---

[3] www.epa.gov/compliance/resources/policies/nepa/revised-PM2-5-NAAQS-NEPA-pg.pdf.

9

expressed as **concentrations** in the air that people breathe. For example, the NAAQS for $PM_{10}$ is equal to a certain number micrograms of $PM_{10}$ per cubic meter of air, averaged over a 24-hour time period. 40 C.F.R. § 50.6(a).

Here, FTA conducted no analysis of whether local air pollutant concentrations resulting from construction activities will cause or contribute to an exceedance of EPA's health-related standards or exceed any alternative health-related criteria of FTA's choosing. Rather, the FEIS sidesteps the issue entirely by comparing the "pounds per day" data to what it calls the "SCAQMD Thresholds." AR1199-1200. The Addendum and Metro's revised findings report that—with mitigation—particulate matter emissions would be less than the specified SCAQMD Thresholds and, on that basis, concludes that the "air quality particulate matter impacts during construction would be reduced to a less than significant level." AR284.

What the FEIS and Addendum do not disclose is that the "SCAQMD Thresholds" it cites as their benchmark have nothing at all to do with **local** air quality. Rather, they are the "**regional** emission thresholds" promulgated by the South Coast Air Quality Management District (SCAQMD). According to SCAQMD, these regional emission thresholds are set to determine when "mass daily emissions [] may have significant adverse **regional** effects." SCAQMD, *Final – Methodology to Calculate Particulate Matter (PM) 2.5 and PM 2.5 Significance Thresholds*, p. 7 (Oct. 2006) (emphasis added).[4]

Thus, the FEIS and Addendum avoid taking **any** look at the effects of extended construction activities on **local** air quality. Metro's conclusion that Project construction will not result in a significant adverse effect on air quality **in the region** as a whole says nothing about whether people who breathe the air in the vicinity of a construction site will be inhaling unhealthful concentrations of particulate matter and other air pollution.

In overlooking this manifestly significant issue, FTA ignores guidance appearing in

---

[4] http://www.aqmd.gov/home/regulations/ceqa/air-quality-analysis-handbook/pm-2-5-significance-thresholds-and-calculation-methodology.

THE CITY OF BEVERLY HILLS' MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 12-9861-GW (SSX)

the very document it cites in making the comparison of gross air emissions to the SCAQMD Thresholds. SCAQMD recommends that for *localized* impacts, agencies employ a different methodology, utilizing specified "localized significance thresholds." *Id.* at 3. SCAQMD correctly notes that "[d]etermining localized air quality impacts requires dispersion modeling." *Id.* at 4. SCAQMD's observation about the need for dispersion modeling to analyze localized impacts is consistent with U.S. EPA's guidance (*see supra*, note 3) and with the approach *Metro itself* initially suggested it would follow here. In its *Construction and Mitigation Technical Report*, published in August 2010, Metro acknowledged that EPA has promulgated NAAQS for certain "wide-spread pollutants…considered to be harmful to public health and the environment" and that "[e]ffects of construction emissions on ambient air quality are evaluated using these standards." AR12688. Inexplicably, the FEIS failed to follow through on this approach, and—notwithstanding Metro's own stated evaluation criteria—does not use the NAAQS to evaluate the effects of construction emissions on ambient air quality.[5]

Nor does it appear that FTA's departure in this regard was inadvertent, as the FTA did complete a dispersion analysis for the Project's *operational* emissions, which it unsurprisingly found would provide a slight air quality benefit. AR967-975, 12340, 12344. Yet FTA conducted no such analysis for the much greater *construction* emissions, which, unlike the Project's operations, are expected to be adverse. *Compare* AR965-66 (operations) *to* AR1199-1200 (construction); *see also* AR20715.

The Agencies' sleight of hand with the "SCAQMD Thresholds" also violates NEPA's requirement that agencies

> shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement.

---

[5] The agencies also ignored the earlier recommendation, in Metro's *Air Quality Technical Report*, that the "effects of $PM_{10}$ and $PM_{2.5}$ emissions for the project are [to be] examined on a localized, or microscale, basis, a regional basis and a statewide basis." AR121304.

40 C.F.R. § 1502.24. Neither the FEIS nor the Addendum discloses that the "SCAQMD Thresholds" it cites are "regional emission thresholds" and that SCAQMD recommends a different approach for analyzing local air quality impacts. Nor does the FEIS disclose that its approach to air quality analysis is inconsistent both with EPA guidance and Metro's own *Construction and Mitigation Technical Report*.

### 2.  FTA Failed to Assess Public Health Impacts from Construction Emissions.

The FEIS's failure to determine how construction-related air pollution will impact local air quality led to another material omission in the FEIS: its utter failure to assess the public health impacts of the massive-sale construction work. Thus, nowhere does the FEIS analyze whether the dust and diesel emissions emanating from mass soil excavations and tens of thousands of construction trucks in close proximity to a school and other sensitive uses will impair the short- or long-term health of the school children, preschoolers, residents, and elderly in the affected areas. This omission directly contravenes NEPA, which expressly requires consideration of the "degree to which the proposed action affects public health." 40 C.F.R. § 1508.27(b)(2); *see also* 42 U.S.C. § 4331 (NEPA's purpose is to "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings" and to "attain the widest range of beneficial uses of the environment without degradation [or] risk to health or safety."); *Citizens Against Toxic Sprays, Inc. v. Bergland*, 428 F.Supp. 908, 927 (D. Or. 1977) ("No subject to be covered by an EIS can be more important than the potential effects of a federal program upon the health of human beings.").

### 3.  FTA's Failure to Analyze Local Air Quality Impacts from Construction Precluded an Adequate Discussion of Mitigation.

FTA's failure to assess whether the Project would cause localized air pollution and public health impacts was not just an academic oversight. One material consequence of that failure is that FTA paid only superficial attention to whether and how dust and other particulate emissions from construction activities could be minimized. As one mitigation measure, the FEIS recommends the use of "Tier 3 or greater engine standards." AR1202. The term "Tier 3" refers to EPA emission standards for non-road diesel equipment that, even

12

as of 2012 when the FEIS was published, had been superseded by EPA's more stringent Tier 4 standards. *Compare* 40 C.F.R. Part 89 (Tier 3 and earlier standards) *to* 40 C.F.R. Part 1039 (Tier 4). Lacking any analysis of local air quality impacts, FTA was denied the information it needed to decide whether to require the use of Tier 3 or the cleaner Tier 4 diesel engines. Similarly, FTA failed to discuss the possibility of requiring air quality monitoring near excavation sites or the maximum use of electrical, rather than diesel, construction equipment.

FTA also never considered the feasibility of moving the construction staging areas further from sensitive uses such as BHHS. According to the FEIS, the laydown area for Constellation Station will be the "main base of operations for Phase 2 [construction]" (i.e., the main base of operations for the 2.5 miles of tunneling beneath Beverly Hills). AR1692. Part of the "lay-down" areas for this construction work will be located on a lot beside Century Park East, immediately adjacent to a BHHS athletic field used by students and other City residents and in close proximity to buildings and other fields on the BHHS campus. AR520. The FEIS fails to acknowledge that Metro is planning to locate such intensive construction activities adjacent to these facilities and thus fails to examine whether it would be feasible to locate these activities further from BHHS as a reasonable mitigation measure.

The fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). Here, the FEIS is wholly lacking in information on an issue of critical environmental importance, and unless the Court intervenes, FTA's review of the Project will not have achieved the objectives of NEPA, to the material detriment of the City, its residents, and school children.

### B. The FEIS Failed to Disclose the Potential Environmental Impacts of the Project's Catastrophic Risks.

NEPA is designed to "insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug." *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973). The required NEPA analysis is not confined to environmental consequences that are certain to occur. NEPA also requires agencies to

13

1    analyze the environmental impacts of potentially catastrophic, but less likely, events.

2    *Robertson*, 490 U.S. at 354-55 (NEPA analysis must "describe the consequences of a remote,

3    but potentially severe impact"). Such analysis is critical to provide decisionmakers with the

4    information needed to make informed decisions that consider the potential environmental

5    impacts of their actions.

6    In *San Luis Obispo Mothers for Peace v. NRC*, 449 F.3d 1016 (9th Cir. 2006), the

7    Ninth Circuit emphasized the importance of disclosing the potential environmental

8    consequences of low-probability catastrophic risks that could result from a project. There,

9    the Nuclear Regulatory Commission (NRC) had failed to disclose and consider the

10   environmental consequences of a terrorist attack on a proposed spent-fuel storage facility. *Id.*

11   at 1019. The court rejected NRC's position that such an attack was "too far removed from

12   the natural or expected consequences of agency action." *Id.* at 1029-31. Instead, because the

13   possibility was not "so 'remote and highly speculative'"—especially given NRC's

14   imposition of design and operational requirements to protect against such attacks—NRC was

15   required to include "an analysis of the range of environmental impacts likely to result in the

16   event of a terrorist attack." *Id.* at 1033-34.

17   Similarly here, FTA was required to disclose the range of potential environmental

18   impacts associated with tunneling beneath a high school through a designated methane zone,

19   in an urban area with known and unknown oil wells and seismic faults whose asserted

20   locations the Agencies repeatedly shifted in the course of these proceedings. These specific,

21   unusual risks—which until recently were thought to be so severe as to be the subject of a

22   Congressional funding ban—include the potentially catastrophic impacts of explosions,

23   subsidence, and tunnel collapse. AR38164. And just as NRC had imposed requirements to

24   reduce the risks of a successful terrorist attack on spent nuclear storage facilities, thereby

25   establishing that such a circumstance could not be dismissed as remote, the Agencies here

26   have required that certain steps be taken to design and operate the new Subway to reduce

27   some of the risks of tunneling in a methane zone and in an area with oil wells and faults.

28   FTAAR67-69, 94. The EIS presents a rosy-colored picture of Metro's belief that it can

14

1  tunnel safely through anything, but it is undisputed that the EIS fails to disclose or analyze
2  the range of environmental impacts that would result in the event that Metro is unsuccessful
3  in avoiding an accident arising from the risks that Metro itself has identified as specific to
4  this Project.  That these risks are not likely and may not be quantifiable—just as the risks of
5  a terrorist attack on a spent nuclear storage facility are not likely and may not be
6  quantifiable—does not excuse FTA from disclosing the environmental impacts of an
7  accident that could occur as a result of known risks inherent in the Project's complex
8  environmental setting.

9          NEPA provides specific mechanisms for addressing such risks, even when agencies
10  are confronted with less-than-perfect data. If the agency faces "incomplete or unavailable
11  information," it must comply with enumerated disclosure requirements. 40 C.F.R. § 1502.22
12  (setting forth the four types of information agencies **must** provide in such circumstances).
13  And if the agency is faced with a disagreement among experts, it can rely on one viewpoint
14  so long as it discusses "any responsible opposing view." 40 C.F.R. § 1502.9(a)-(b); *Pac.*
15  *Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 482 F.Supp.2d 1248, 1255 (W.D. Wash. 2007)
16  ("[T]he agency must not only recite dissenting opinions, it must 'analyze,' 'respond to' and
17  'discuss' them.") (quoting *Ctr. for Biological Diversity v. USFS*, 349 F.3d 1157, 1168 (9th
18  Cir. 2003)). This framework allows federal agencies to move forward with difficult projects,
19  but ensures that they first confront all associated risks. As detailed below, FTA violated
20  NEPA here by approving an EIS that failed to comply with any of these requirements.

21          Moreover, while the Agencies were ignoring or downplaying the risks associated with
22  tunneling under BHHS, they were simultaneously justifying their most controversial siting
23  decision based on incomplete information about another, low-probability risk, albeit with
24  potentially serious consequences: the risk of actual fault rupture at a Santa Monica Station—
25  as opposed to the lesser groundshaking that could also occur at the newly favored
26  Constellation Station a block away. The resultant switch to the Constellation site was
27  predicated on a hypothesized active fault at Santa Monica Blvd., whose existence has not
28  been confirmed by trenching or any other direct observation. This inconsistent treatment of

15

analogous risks, and the failure to confirm the existence of a fault at Santa Monica Blvd., precluded the agencies from making an informed decision, as NEPA requires.

### 1.   FTA Ignored Potentially Catastrophic Risks Associated with Tunneling Through Pockets of Explosive Gases.

Virtually the entire Project is located within the methane risk zone designated by Los Angeles after the explosion at the Ross "Dress-for-Less" store in 1985. AR1037. Within this zone, the distribution of soils containing methane and hydrogen sulfide—a highly toxic gas that shares methane's explosive properties—is not well understood. AR31276-78. Nevertheless, investigations of the 1985 explosion did establish that pockets of methane and hydrogen sulfide can move unpredictably through soils, particularly in areas with abandoned oil wells or seismic faults. AR63178, 60693, 54495, 54591. Tunneling and other construction activities can disturb gas pockets, thereby releasing gas to the surface, where it can collect below buildings and streets in potentially dangerous concentrations. AR54487, 54565. This risk is particularly acute for shallow tunnels, such as those proposed here, as the gas has a shorter migration path. AR64090.

FTA's consideration of this hazard violated NEPA in several ways. First, the EIS contains no information about the risks of gas migration to the surface or gas accumulation under existing buildings, and the resultant risk of explosions. Second, the EIS fails to discuss "all major points of view" regarding the risks of tunneling through methane and areas with unmapped oil wells, even though dissenting scientific information was included in the Agencies' files. Finally, the EIS failed to disclose the potential environmental and public health consequences of a methane gas explosion, should one occur.

### a.   FTA Failed to Take the Required Hard Look at the Potential for Tunneling to Force Methane Gas to the Surface.

The EIS acknowledges the presence of underground methane gas on the westside and the risk of this and other hazardous gases escaping into Metro's newly constructed tunnels and station areas; it also proposes measures to prevent the intrusion of these gases into the

new Metro facilities. *E.g.*, AR567, 1038, 1048-51, 1054-55, 1220-1224.[6] However, the EIS completely ignores the separate risk that tunneling through methane poses to older, existing buildings. Nowhere does it explain that tunneling and other construction activities can disturb gas pockets, thereby releasing gas to the surface, where it can collect below building foundations and pavement in potentially dangerous concentrations. *See* AR54487, 54565. Likewise, while investigations of the 1985 Ross-Dress-for-Less explosion established that explosive gas can move unpredictably through abandoned oil wells or seismic faults (AR63178, 60693, 54495, 54591), the EIS does not discuss this concern.

In response to Metro's myopic focus on protecting its own facilities from methane intrusion, BHUSD alerted the Agencies to the EIS's omission of any discussion of the risk of surface explosion to existing and older buildings from the tunneling. AR1983, 1988 ("Of greatest concern is the potential that tunneling…could lead to an explosion and potential injuries on the surface…. The Draft EIR/EIS does not adequately analyze such potential impacts to sensitive areas such as BHHS."). Despite this comment, "no new studies were performed, no additional information was collected, [and] no further inquiry was made." *Sierra Club v. U.S. Army Corps of Engineers*, 701 F.2d 1011 (2d Cir. 1983).

The EIS's ultimate conclusion—that the subway can be constructed safely—is thus based on incomplete information. As with the NEPA document at issue in *San Luis Obispo Mothers for Peace*, which failed to address catastrophic risks, the EIS here should have discussed the low-probability risk to existing buildings and disclosed the likely environmental consequence if a methane explosion were to occur. 449 F.3d at 1031; *see also Motor Vehicle Mfrs.*, 463 U.S. at 43 (agency action is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem"). Only after providing such information could FTA, for example, weigh whether these consequences are worth the risk, whether some alternative should instead be pursued, or whether mitigation measures could

---

[6] Indeed, when the City's experts confirmed the FEIS adequately addressed this particular methane hazard, the City promptly made this information available to Metro. AR32582.

THE CITY OF BEVERLY HILLS' MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 12-9861-GW (SSX)

be adopted to address this particular risk.

The potential difficulties associated with predicting the likelihood or environmental consequences that might result from hazardous gas migration do not excuse FTA's lack of compliance. If incomplete information is "essential to a reasoned choice among alternatives," the agency must obtain the information and include it in the EIS, unless the costs are "exorbitant." 40 C.F.R. § 1502.22. As hazardous gases are more likely to pose a threat in areas with faults or other soil discontinuities (AR63178, 60693, 54495, 54591), and with older structures that have not been constructed to prevent or monitor for methane accumulation (AR31277, 60693), alternative routes pose varying degrees of risk. This missing information is therefore essential to a reasoned choice among alternatives.

NEPA also dictates how an agency must respond if the information cannot be obtained: the agency must, at a minimum: (1) state what information is lacking, (2) explain its relevance, (3) provide a summary of existing evidence, and (4) employ "generally acceptable" theoretical approaches to evaluate the impacts. 40 C.F.R. § 1502.22(b)(1)-(4). The EIS's omission of these mandatory steps violates NEPA as a matter of law. *Ctr. for Biological Diversity v. BLM*, 422 F.Supp.2d 1115, 1165 (N.D. Cal. 2006) (violation of section 1502.22 where EIS does not contain any statement that there is incomplete or unavailable information); *Native Vill. of Point Hope v. Salazar*, 730 F.Supp.2d 1009, 1018 (D. Alaska 2010) (same); *Sierra Club v. DOT*, 962 F.Supp. 1037, 1043 (N.D. Ill. 1997).

### b.  FTA Failed to Disclose Contrary Scientific Opinion Contained in Its Own Administrative Record.

FTA also violated NEPA because the EIS fails to discuss responsible opposing views regarding the surface migration risks posed by tunneling through methane gas. According to the study Los Angeles commissioned in response to the 1985 explosion, gas moves through the ground as a result of changes in pressure. AR54565. Other studies show that faults and well bores act as prime conduits for such gases. AR60693, 55054-58, 55071-72. And as Metro's predecessor agency recognized as far back as 1984, "[c]onstruction activities…may change the pressure and concentration of gases at any specific location." AR54487. In other

words, tunneling through underground faults, abandoned oil wells, varying concentrations of gases, and heterogeneous soils inevitably risks surface migration of gases to the surface. *Id.*; *see also* AR31277, 23738-39. FTA was undeniably on notice of these concerns, which were identified in studies included in the administrative record. Yet, because the EIS includes *no* discussion of gas migration and surface accumulation, let alone a discussion of these opposing views, it violates NEPA's requirement to discuss contrary scientific views. 40 C.F.R. § 1502.9(a)-(b).

In fact, the only "discussion" of this issue occurred ***after*** the FEIS was released, in response to a study submitted by the City that pointed out that "[f]aults and existing oil wells...can act as conduits for gases, allowing pockets of concentrated gas to form." AR31277. In a response issued after the FEIS was released, Metro asserted that "the ***presence*** of the tunnel will not change the [gas] flow" "to the surface." AR38456 (emphasis added). This conclusory statement says nothing about ***construction*** of the tunnel. It contains no disclosure or analysis of the dissenting scientific expert opinion. And it occurred after the FEIS was released. It therefore does not meet NEPA's requirements. *Ctr. for Biological Diversity*, 349 F.3d at 1167 (agency violated NEPA where its asserted consideration of the issue and contrary opinions was not contained in EIS itself); *Pac. Coast Fed'n of Fishermen's Ass'ns*, 482 F.Supp.2d at 1255 (relegating discussion of opposing scientific opinion "to the comment and response section of the appendix" violated NEPA). The EIS must fail "not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections." *Sierra Club v. Bosworth*, 199 F.Supp.2d 971, 981 (N.D. Cal. 2002)) (citation omitted).

## 2.      FTA's Handling of Incomplete Information about the Risks Posed by Unknown Oil Wells Violates NEPA.

The EIS's analysis of the potentially catastrophic impacts caused by tunneling through oil wells is similarly inadequate. The selected subway route traverses a number of oil fields, riddled with known wells. AR1035-36. While some oil wells are accurately listed on state records, many older wells were not mapped or properly capped following the end of their

1  useful life. AR1039, 31278. Consequently, undisclosed and improperly abandoned oil wells
2  are likely present throughout the westside. AR31278, 38182.

3       Despite these hazards, FTA approved the Project with incomplete information, never
4  checking the length of the proposed route for most unmapped wells. Metro's consultants did
5  seek to identify unmapped wells below certain open space areas (AR31278), but the
6  Agencies deferred until **after** project approval the identification of unmapped wells under
7  existing structures such as the historic BHHS and City residences. AR1223-24.

8       NEPA requires a different approach. When information is incomplete or unavailable—
9  as FTA claims here—the agency is required to evaluate whether such information is
10 "essential to a reasoned choice among alternatives." 40 C.F.R. § 1502.22(a). The
11 administrative record is silent as to whether FTA ever undertook this evaluation.
12 Nevertheless, it is clear that if an abandoned well is located below an existing building—
13 especially a historic property such as BHHS—abandonment will require significant surface
14 disturbance and may warrant realignment of the tunnel. AR38194 (re-abandonment requires
15 excavation and sealing off the well), 29121 (California's Dep't of Oil, Gas and Geothermal
16 Resources noting that building over or in proximity to abandoned wells "should be avoided if
17 at all possible"). Moreover, if an abandoned oil well is discovered during tunneling, and the
18 tunnel boring machine stops to allow proper abandonment, the risk of surface subsidence
19 dramatically increases. AR38542. Information about well location is therefore necessary
20 **before** a decision about the alignment is made.

21      As information about the location of abandoned oil wells is both incomplete and
22 essential, FTA was required to evaluate whether the cost to obtain this additional information
23 prior to making its decision was exorbitant. 40 C.F.R. § 1502.22; *Greater Yellowstone*
24 *Coalition v. Lewis*, 628 F.3d 1143, 1155 (9th Cir. 2010). Although FTA once again
25 conducted no such evaluation, the record establishes that it is possible to obtain the
26 information at an acceptable cost. Metro has committed to checking the alignment **after**
27 **Project approval** (AR38192-93, 38458), but the Agencies never explained why this work
28 could not have been performed as part of the EIS. However, even if an implicit

20

determination was made that the analysis was too time consuming or expensive, FTA was nevertheless required to show its work, by complying with the section 1502.22's four-pronged disclosure requirement. FTA's failure to do so violates NEPA. *Native Vill. of Point Hope*, 730 F.Supp.2d at 1018 (agency violated NEPA where it "failed to determine whether missing information was relevant or essential…and failed to determine whether the cost of obtaining the missing information was exorbitant, or the means of doing so unknown"). Moreover, as with the environmental impacts of a potential methane gas explosion, FTA was required to disclose in the EIS the environmental impacts that would occur if an unknown oil well is discovered beneath the historic BHHS or other existing buildings. *San Luis Obispo Mothers*, 449 F.3d at 1031.

### 3. The EIS's Incomplete Information about the WBHL Precludes a Reasoned Choice among Alternatives.

While FTA failed to consider the low probability catastrophic impacts associated with methane and oil wells, it changed its most crucial siting decision based on another low probability risk. The Agencies insisted that the low probability, remote risk of actual fault rupture (rather than lesser groundshaking) directly beneath Santa Monica East Station justified—if not dictated—their selection of Constellation Station. AR37101. However, the EIS did not discuss the incompleteness of the data Metro relied on to reach this conclusion, or the scientific disputes regarding its accuracy. This omission is just as harmful to the NEPA process as the failure to discuss certain tunneling risks, as it precluded FTA from making an informed choice about the most contentious aspect of the entire Project.

The FEIS asserts that the WBHL is a "north-northwest trending fault that will cross the [Subway] alignment…in the Century City Area." AR1028. Based on this assertion, FTA's ROD concludes that the Santa Monica East Station "is located above a northern extension of the Newport-Inglewood Fault zone, and thus [is] not considered a viable option for the station." FTAAR36. Based on this same information, the FEIS purports to definitively conclude that the same newly discovered active fault is not located one block to the southwest, beneath the proposed Constellation Station site, and that this location does not

1   pose any risk from seismic activity. AR1043. In other words, the EIS's conclusions about the

2   location and activity of the WBHL and related seismic faults "influence, if not determine,

3   [FTA]'s selection of the Century City Constellation Station." AR1029.

4       Nowhere, however, does the EIS disclose that—throughout the environmental review

5   process—the Agencies had woefully incomplete and ever-shifting information about the

6   existence and specific location of the WBHL. Indeed, at the time that the Draft EIS was

7   released, the Agencies had no actual evidence about the WBHL, or whether it was an active

8   fault. According to the DEIS itself, their assertions regarding the WBHL were based on

9   "speculation." AR19732, 6687. Over the next 18 months, Metro and its consultants

10   undertook a series of studies—including geophysical seismic reflections, bore holes, and

11   cone petrometer tests—which attempted to ***indirectly*** determine the location of fault strands

12   in the area. FTAAR33977; 87935-36. Based on inferences in the data, Metro characterized

13   the WBHL as the northern extension of the active Newport-Inglewood fault zone, and on

14   that basis ***assumed*** that the WBHL was also active. AR37100. Metro, however, "chose not to

15   conduct the normal trenching and sampling work necessary to properly date the fault strands

16   that it did find." FTAAR33977.

17       Given the severe consequences for its mission that would result from the identification

18   of an active fault beneath the High School, BHUSD alerted FTA that Metro's information

19   was incomplete. FTAAR33975-81. BHUSD pointed out that it was in the process of doing

20   the trenching and sampling work that Metro had failed to undertake—which is the only way

21   to ***directly*** identify the presence of active earthquake faults—and that its investigation would

22   be overseen by CGS, the state agency with exclusive purview to identify active earthquake

23   faults in California. *Id.*; *see also* AR32958; FTAAR3923-32.

24       Accordingly, both BHUSD and the City urged that the Agencies delay publishing the

25   FEIS until this information could be gathered, so that the Agencies could act based upon

26   complete information. FTAAR33975-88, 3973-78; AR31227, 31357-58. The City worried

27   that without complete information on the seismicity of the WBHL, the Agencies would paint

28   themselves into a corner that left them no choice but to select the Constellation Station

22

location. Inexplicably, the Agencies refused to wait for the complete information, and instead issued the FEIS, which relies solely on the indirect data collected by Metro and its consultants. AR1029. By the time BHUSD's experts completed their trenching work later in 2012—an effort that the Agencies themselves should have undertaken and which established that there had been no earthquake activity in the trenched area for at least 100,000 years and that therefore the WBHL *is not an active fault* beneath BHHS (AR33001-02)—FTA had already released the FEIS, which dismissed a Santa Monica Station based on Metro's contrary assumptions about this same fault. *See* Clark Decl., ¶ 5 & Ex. 1 (composite map illustrating asserted faults and station locations pursuant to Fed. Rule Evid. 1006).

Subsequent events proved that the BHUSD and City concerns as to the rushed pace of the Agencies' decisionmaking were well-founded. A telling example is their response to the District's trenching that showed no active earthquake fault under BHHS. The Agencies did not dispute the accuracy of this report, which CGS later confirmed. FTAAR3925-32, 87699-705. Nor did they conduct their own trenching or pause to question whether some of their other assumptions might be equally unfounded. Instead, Metro's consultants produced a new fault map that simply moved the location of the assertedly active earthquake faults to the areas immediately outside the area trenched by BHUSD. AR38604. After additional trenching work at 10000 Santa Monica Blvd. confirmed and broadened the results of BHUSD's trenching, the Agencies yet again shifted their post-hoc justifications, now claiming that a Santa Monica Station may be precluded not by the WBHL, as stated in the FEIS, but by a different earthquake fault altogether, running in an entirely different direction. FTAAR88622.

The City does not contend that NEPA requires FTA to accept the accuracy of BHUSD's reports. NEPA does, however, require that FTA prepare an EIS that provides both the agency and the public sufficient information to understand where scientific information is weak or incomplete, and the consequences of proceeding under such circumstances. *Alliance for Wild Rockies v. Bradford*, 720 F.Supp.2d 1193, 1222 (D. Mont. 2010) (without a discussion of the problems associated with a scientific study, "the public cannot adequately

evaluate the agency's decision-making process"); *Lands Council v. Powell*, 395 F.3d 1019, 1032 (9th Cir. 2005) (requiring disclosure of weakness in scientific model's assumptions). Here, the Agencies never explained that their conclusions were based only on indirect seismic studies, which later turned out to be erroneous.

Moreover, the EIS does not disclose that the Agencies knew they were proceeding on incomplete information, as BHUSD was conducting additional studies that would confirm or refute Metro's underlying assumptions. But NEPA requires such disclosure, as it is clear from the EIS and FTA's ROD that this missing information was "essential to a reasoned choice among alternatives." 40 C.F.R. § 1502.22(a). The Agencies cite the presumed activity of the WBHL as their determinative reason for excluding the otherwise viable Santa Monica East Station that would avoid tunneling under BHHS. FTAAR36; AR1029. Consequently, if FTA decided that it could not await the completion of trenching and CGS review, it was required to (1) inform the public that its seismic information was incomplete, (2) explain the relevance of this missing information, (3) summarize all existing scientific evidence, and (4) evaluate such impacts based on "generally accepted" theoretical approaches. 40 C.F.R. § 1502.22. Here, the EIS skipped steps 1-3, and proceeded directly to step four, allowing FTA to support its decision to eliminate the Santa Monica East Station —which, as a component of Phase 2 of the Project, is not likely to be built for years (AR1184)—without grappling with the weaknesses of Metro's evidence. This Court should not countenance such rubber-stamping. *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 236 (5th Cir. 2006) ("An agency may not, however, 'reflexively rubber stamp' information prepared by others.").

## C. FTA's Failure to Examine Alternate Routes to Constellation Violated NEPA.

Analysis of alternatives is the "heart of the environmental impact statement." 40 C.F.R. § 1502.14. To that end, NEPA requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives." *Id*. The "'existence of a viable but unexamined alternative renders an environmental impact statement inadequate.'" *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995). The

24

Ninth Circuit has repeatedly invalidated EIS's that fail to meet this standard.

### 1. The EIS Contains No Analysis of Any Alternative Route to Constellation that Would Avoid Tunneling under BHHS.

In its comments on the DEIS, the City requested that "Metro explore alternatives that do not involve tunneling under [BHHS] or residential properties," including alternate alignments to reach Constellation Station if, notwithstanding Metro's then publicly stated preference for a Santa Monica Station, the Agencies ultimately selected the Constellation location. AR2010, 2016. Metro's Board initially recognized that such analysis was needed, directing its staff "to analyze the possibility of moving the subway tunnel in order to avoid all school buildings and avoid impacting any future [BHUSD] plans." AR23176.

Despite these requests, the FEIS prepared by Metro's consultants failed to analyze *any* alternative routes to Constellation Station that would avoid tunneling under BHHS. *See* AR667. This failure is particularly troubling because the FEIS rejected the previously preferred location for the Century City station—at Santa Monica Blvd.—as not "viable" due to the theorized presence of an active earthquake fault there. AR519-20. Thus, the proposed route to the newly preferred Constellation location was presented as the *only* choice. AR381-82; FTAAR36-37.

The City joins in BHUSD's argument that FTA failed to take the requisite hard look at potential faulting beneath Constellation Station. However, even assuming *arguendo* that FTA had taken a hard look at this issue, FTA's refusal to consider alternate alignments *to reach* the Constellation Station violates NEPA as matter of law. *See* 42 U.S.C. § 4332(E) (directing federal agencies to "study, develop, and describe appropriate alternatives"). In *Southeast Alaska Conservation Council v. FHWA,* for instance, plaintiffs requested that FHWA study the possibility of improving existing ferry services as an alternative to constructing new roads and terminals. 649 F.3d 1050, 1053 (9th Cir. 2011). Despite FHWA's insistence that the viability of this alternative was "remote and speculative," the Ninth Circuit held that "given the dearth of reasoned explanation in the EIS for its rejection," FHWA's refusal to examine this alternative violated NEPA. *Id.* at 1059. Similarly, as Judge

Kronstadt recently ruled in an analogous case against FTA and Metro concerning a nearby subway project, the Agencies' failure to present alternate tunneling techniques, or "to explain in the FEIS, at least briefly, the reasons that such alternatives were rejected," violated NEPA. *Today's IV, Inc. v. FTA*, at *24 (Case No. 2:13-cv-00453-JAK-PLA) (ECF No. 123, May 29, 2014). Numerous other Ninth Circuit decisions are in accord.[7]

### 2. FTA Failed to Independently Evaluate or Consider Alternatives Proposed by the City.

The City had expected that—consistent with the directives of NEPA (42 U.S.C. §§ 4332(2)(C)(iii), 4332(E)) and the Metro Board (AR23176)—the Final EIS would analyze alternative routes that avoided tunneling under BHHS. When the FEIS was published without any such analysis,[8] the City engaged experts to develop its own alternative alignments for the Agencies' consideration. These experts developed three alternate routes to reach Constellation Station without tunneling under BHHS, which the City presented to FTA on May 22, 2012. AR35280, 35288-89, 35380-82.

Inexplicably, FTA failed to consider, address, or respond to any of the City's proposed alternatives. Neither FTA's ROD (FTAAR33-38) nor its Summary of Comments on the FEIS (FTAAR121-23) mentions the City's proposals. FTA may nevertheless argue that it relied upon Metro's purported analysis of these alternatives to reject them. But there is no

---

[7] *See, e.g.*, *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050-51 (9th Cir. 2013) (invalidating EIS that failed to examine a viable alternative); *Oregon Natural Desert Ass'n*, 625 F.3d at 1123-24 (same); *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1095 (9th Cir. 2006) (same); *NRDC v. USFS*, 421 F.3d 797, 814 (9th Cir. 2005) (same); *Alaska Wilderness Recreation*, 67 F.3d at 730; *Coal. for Canyon Pres. v. Bowers*, 632 F.2d 774, 784 (9th Cir. 1980) (same); *Friends of Bitterroot, Inc. v. U.S. Forest Serv.*, 900 F.Supp. 1368, 1374 (D. Mont. 1994) (agency violated NEPA by failing to consider an alternative about which there had been "contentious and long standing debate").

[8] The FEIS's sole response was the conclusory (and ambiguous) assertion that "there is no reasonable tunnel alignment that does not pass under homes in Beverly Hills *or* structures within the school campus." AR2018 (emphasis added), *see also* AR1406. This assertion is unsupported by any evidence in the record and falls far short of the actual ***analysis*** required. *See* Part I.C.1, *supra*.

1   record evidence that FTA ever considered these alternatives *at all*, much less in the EIS as

2   NEPA requires. 40 C.F.R. § 1502.14(a); *W. Land Exch. Project v. BLM*, 315 F.Supp.2d

3   1068, 1096-97 (D. Nev. 2004) (NEPA prohibits rejection of alternative where agency's

4   reasoning "was never made part of the NEPA analysis"); *Dubois v. U.S. Dep't of Agric.*, 102

5   F.3d 1273, 1287 (1st Cir. 1996) ("Because of the importance of NEPA's procedural and

6   informational aspects, if the agency fails to properly circulate [its rejection of alternatives]

7   for review by interested parties, then the EIS is insufficient even if the agency's actual

8   decision was informed and well-reasoned.").

9        NEPA requires FTA to exercise its own independent analysis and judgment before

10  eliminating an alternative from consideration. *Utahns for Better Transp. v. DOT*, 305 F.3d

11  1152, 1165 (10th Cir. 2002) (EIS's analysis of alternatives inadequate where FHWA failed

12  to verify cost estimates used by state agency to eliminate alternative); 23 U.S.C. § 139(c)(3)

13  (project sponsor such as Metro may prepare an EIS only if FTA "furnishes guidance in such

14  preparation and independently evaluates such document"); 23 C.F.R. § 771.109 (FTA must

15  "independently evaluate[]" any environmental review documents prepared by Metro). There

16  is no record evidence that FTA did so here.

17       Moreover, while Metro staff asserted that the City's proposed alternative alignments

18  were unreasonable, their conclusory rejection of these alternatives was a hastily fabricated

19  post-hoc justification for a decision that Metro's Board had already made. Specifically, while

20  the City retained consultants to develop its alternative proposals as quickly as possible after

21  the FEIS was published without any analysis of alternative routes to the Constellation

22  Station, it was not able to complete those proposals until shortly before Metro's final

23  approval hearing. AR38812-27.

24       This chronology of events helps explain what the record makes unmistakable clear:

25  when Metro's staff responded to the City's alternative alignment proposals at the May 24,

26  2012, final approval hearing (*see* AR23827-29; SAR31727-33), only two days after the City

27  had put forward its alternative alignment proposals on May 22, 2012, their response did not

28  include, and was not based on, any studies or investigation of the City's proposals. Instead,

27

THE CITY OF BEVERLY HILLS' MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 12-9861-GW (SSX)

Metro's response consisted almost entirely of staff's oral assertions that the City's proposed alignments were unreasonable because they would "require about a 25 mile an hour operating speed" due to track curvature and would potentially result in additional cost due to lower track levels. AR23827-29. However, these assertions are directly belied by other evidence in the record. For instance, the FEIS itself explains that trains must already slow by as much as 25 miles per hour as they approach Constellation Station even under the adopted alignment. AR18181, 18185. Similarly, the trains must come to a complete stop at the station itself, which is less than one-half mile from this approach. In analogous circumstances, the Ninth Circuit has set aside agency decisions where the proffered rational for excluding an alternative was belied by other record evidence. *'Ilio'ulaokalani*, 464 F.3d at 1100.

Moreover, the record is devoid of any empirical comparison between the additional reduction of speed (and the concomitant increase in travel time) assertedly required under the City's proposed alternatives and the alignment Metro selected. The record is likewise devoid of any information regarding the asserted "additional costs" the City's alternatives would impose. Given this lack of analysis in the record, FTA cannot hide behind Metro's unsupported, post-FEIS assertion that alternative routes to the Constellation Station would not meet its speed or cost requirements. *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1311 (9th Cir. 1990) (agency's rigid interpretation of a timber supply contract as preventing it from supplying less than a fixed amount of timber insufficient to justify its failure to consider lower-timber alternative).

### 3. FTA's Actions Deprived Agency Decisionmakers of Information Necessary to Make an Informed Choice.

It may well be that, at the end of the day, FTA would have found the City's alternatives less desirable than the alignment that FTA approved. However, FTA was never presented with the information necessary to make an informed choice between the asserted benefits of the selected alignment and any tradeoffs presented by the City's approach, which would have avoided all tunneling (and the associated risks) under BHHS. In *State of Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982), the Ninth Circuit provided a succinct explanation of the

problem with this approach. That case involved a proposal to designate wilderness areas. While the EIS examined 8 alternatives, none of these alternatives considered designating more than 1/3 of roadless acreage to wilderness. *Id.* at 757, 765. The Ninth Circuit struck down the EIS, emphasizing that

> [t]he policy at hand demands a trade-off between wilderness use and development. This trade-off, however, cannot be intelligently made without examining whether it can be softened or eliminated by [other alternatives].

*Id.* at 767. Similarly here, to the extent that FTA must balance trade-offs between train speed and project cost on the one hand, and the risks of tunneling under BHHS on the other, FTA was unable to "intelligently [make]" that policy decision without any EIS analysis of the benefits and costs of alternative routes to Constellation Station.

## II. FTA Violated Section 4(f) of the Department of Transportation Act by Failing to Adequately Protect Park and Recreation Resources.

Section 4(f) of the Department of Transportation Act of 1966 sets forth a powerful mandate to preserve the nation's parks and recreation areas from the adverse impacts of federal transportation projects. It prohibits agencies such as FTA from "approv[ing] a transportation program or project…requiring the use of [a] publicly owned…park [or] recreation area" unless there is no "prudent and feasible" alternative to doing so. 49 U.S.C. § 303(c). Congress intended Section 4(f) to give protection of these sites "paramount importance," so that their value would not "be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes." *Overton Park*, 401 U.S. at 412-13.

To comply with Section 4(f), a transportation agency must undertake a multi-step process. The agency first determines whether the proposed project will "require[] the 'use' of land from a public park, recreation area,…[or] historic site." *Adler*, 675 F.2d at 1091. The term "use" is "construed broadly, not limited to the concept of a physical taking, but includes [the *constructive use* of] areas that are significantly, adversely affected by the project," such as a park or campground adjacent to a proposed highway. *Id.* at 1092; *see also* 23 C.F.R. § 774.15(a) ("A *constructive use* occurs when…the project's proximity impacts are so

29

1   severe that the protected activities, features, or attributes that qualify the property for

2   protection under Section 4(f) are substantially impaired." (emphasis added)). If a project

3   would so "use" a protected resource, then the agency must thoroughly analyze possible

4   alternatives to avoid such use. 49 U.S.C. § 303(c); 23 C.F.R. § 774.3. If there is a "prudent

5   and feasible" alternative that does not impact the 4(f) resource, then the agency **must** choose

6   that alternative. *Id*. If there is no such alternative, the agency may still approve the project,

7   but only after conducting "all possible planning to minimize harm" to the 4(f) resource. *Id*.

8        Here, FTA violated each of these steps with respect to two protected resources: (1)

9   Reeves Park, a city-owned "pocket park" located adjacent to the proposed Wilshire/Rodeo

10  Station; and (2) the recreational and athletic facilities at BHHS.

11  **A.   FTA's Section 4(f) Analysis Failed To Assess Whether the Project Would**
       **"Use" Reeves Park and Failed to Evaluate Whether Such Use Could be**
12     **Avoided or Its Attendant Harms Minimized.**

13       Reeves Park is a small park in downtown Beverly Hills that is used for passive

14  recreational and playground purposes and is located directly adjacent to the "Ace Gallery"

15  building, which will be demolished to serve as the primary staging site for construction of

16  the Wilshire/Rodeo Station. *See* FTAAR49569-70; AR6054. The construction of this station

17  will last about seven years (AR1186), involve 60 to 100 haul truck trips per day during peak

18  construction activities (AR1181), and, according to the EIS, cause significant noise and air

19  quality impacts even after all mitigation measures have been implemented (AR537, 573-74,

20  576, 19307). *See generally* AR12826, 12831 (describing these construction impacts). The

21  DEIS failed to identify Reeves Park as a resource in the area of the Project's construction

22  activities, precluding public comment on the issue. AR19906.

23       Metro's subsequently released draft Section 4(f) Technical Report mentioned

24  construction activities near Reeves Park, but it provided no evaluation whatsoever of

25  whether this intensive construction activity would result in a constructive use of this

26  belatedly acknowledged 4(f) resource. FTAAR3302-03. Indeed, the report's entire "analysis"

27  of the Project's use of park and recreational resources consists of a single sentence, which

28  cross-references a single table. FTAAR3315; *see also* AR 6054-55 (same re final report).

30

This missing analysis initially alarmed FTA staff, whose comments in response ranged from the incredulous to the sarcastic. *See, e.g.*, FTAAR33936 ("***I would think there would be some impact*** upon the park during the construction period. [Has] any discussion occurred amongst the team or with [] Beverly Hills regarding this potential impact?"), 32359 ("Check out the property immediately south of Ace Gallery [Reeves Park]. ***Um…constructive use anyone***?"), 32003 ("In some places, there is an insufficient description of what the use would be…. This is a particular concern in one of the tables that provides a summary of what the 'use' would be."); *see also* FTAAR33924 ("[L]arge portions of [Metro's 4(f) report] did not reflect our comments…. ***Frankly, it's a poor effort*** that makes one question whether the author has enough familiarity with…Part 774 and FHWA's Policy Paper.") (emphases added).[9]

The evident alarm of FTA officials is hardly surprising. For decades, courts have recognized that transportation projects undertaken adjacent to parks and other 4(f) resources could adversely affect those resources and thus be subject to the prohibitions of 4(f) outlined above. *E.g.*, *Brooks v. Volpe*, 460 F.2d 1193, 1194 (9th Cir. 1972) (proposed highway that would encircle, but not go through, a public campground would "use" that campground); *Stop H-3 Ass'n v. Coleman*, 533 F.2d 434, 445 (9th Cir. 1976) (proposed highway passing near a sacred rock "would 'use' land from that historic site"); *Citizens for Mass Transit Against Freeways v. Brinegar*, 357 F.Supp. 1269, 1280 (D. Ariz. 1973) (fact that park was "immediately adjacent to the freeway route is enough to require a 4f statement"); *see also Adler*, 675 F.2d at 1092 ("'A site is considered 'used' whenever land from or buildings on the site are taken by the proposed project ***or*** whenever the proposed project has significant adverse air, water, noise, land, accessibility, aesthetic or other environmental impacts ***on or***

---

[9] An email from another FTA staffer noted that he was not concerned about "constructive use" of Reeves Park because "[t]here is no substantial noise and visual impairments as a result of the project." FTAAR2359. However, this email does not address the ***significant*** noise and air quality impacts that the FEIS later concluded will result during the 7-year construction period. *See* AR537, 573-74, 576, 19307.

1  *around the site*, as per [ ] *Stop H-3 [ ]*.'" (emphasis added)). This case law was later partially

2  codified in the regulations governing "constructive use" of Section 4(f) resources cited

3  above. *See* 23 C.F.R. § 774.15; *see also* Final Rule: Envtl. Impacts & Related Procedures;

4  Constructive Use, 56 Fed. Reg. 13269, 13270 (Apr. 1, 1991).

5      What is surprising, however, are the steps that the Agencies took in response to FTA

6  staff's concerns. Rather than undertaking the additional analysis FTA staff identified as

7  necessary, Metro simply removed the one reference in its draft Section 4(f) Report that at

8  least acknowledged that use of an immediately adjacent staging area could "potentially

9  affect[]" Reeves Park.[10] In other words, the Agencies simply swept the issue under the rug.

10     An agency's determination that a facility is not "used" by a transportation project must

11  be supported by "empirical evidence." *Nat'l Parks & Conservation Ass'n v. FAA*, 998 F.2d

12  1523, 1533 (10th Cir. 1993). The agency must "attempt[] to ascertain the actual impact" of a

13  project on the protected resource. *Id.* Courts will "not defer to" agency judgments that are

14  not based on evidence and reasoned decisionmaking. *Id.*

15     Here, FTA made clear that Metro needed to analyze the Project's constructive use of

16  Reeves Park during construction. Metro did not do so, and FTA approved the Project

17  anyway. Its published Section 4(f) discussion in Chapter 5 of the FEIS and the final Section

18  4(f) Report do not contain any analysis of whether the years of intensive construction activity

19  adjoining Reeves Park will constitute a "constructive use" of that resource. With evidence in

20  the record that heavy construction will occur for up to seven years directly alongside the

21  Park's entire northern border, and without any analysis of potential impacts to the Park, FTA

22  failed to consider whether the Project would result in a constructive use of Reeves Park.

23  Having failed to properly identify the Project's use of Reeves Park, FTA likewise failed to

24

25

26

27

28

---

[10] *Compare* FTAAR3302-03 (draft Section 4(f) Report mentioning potential impact to Reeves Park from possibly locating staging area at Commercial Capitol Tower immediately to the northwest of the park) *with* AR6079 (same section in final Section 4(f) Report contains no mention of impact to Reeves Park from locating actual staging area immediately to the north of the park, where staging area would abut more of the park than the rejected Commercial Capitol Tower alternative).

THE CITY OF BEVERLY HILLS' MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 12-9861-GW (SSX)

1   evaluate and determine whether there were "prudent and feasible" alternatives to avoid this

2   use, or, if not, to conduct "all possible planning to minimize harm" to the Park's users from

3   the 7 years of significant adverse noise and air quality impacts. FTA's actions in nevertheless

4   approving the Project and issuing its ROD were "arbitrary and capricious" and must be set

5   aside. *Nat'l Parks*, 998 F.2d at 1533.

   **B.    FTA Improperly Determined that BHHS's Recreational and Athletic**
6   **Facilities are not Protected by Section 4(f) and Thus Failed to Undertake**
7   **Any of the Required Analysis to Avoid Unlawfully Using Them.**

8        A publicly owned property qualifies as a Section 4(f) resource if it is a locally

9   significant public recreational resource. 23 C.F.R. § 774.17. A property is significant if one

10  of its major purposes or functions is as a public park or recreation area. *Stewart Park &*

11  *Reserve Coal., Inc. v. Slater*, 352 F.3d 545, 556 (2d Cir. 2003). This is true even if that

12  property primarily serves some other non-protected purpose. For example, courts have

13  repeatedly recognized that public school recreational facilities—which have the obvious

14  major purpose of serving school needs—also constitute Section 4(f) resources if the public

15  regularly uses them as recreational facilities. *City of S. Pasadena v. Slater*, 56 F.Supp.2d

16  1106, 1114 n.9 (C.D. Cal. 1999) (recognizing school playing fields as a Section 4(f)

17  resource); *Coal. for Responsible Regional Dev. v. Coleman*, 430 F.Supp. 13, 16 (S.D. W.Va.

18  1976) (same re school playground), *aff'd* 555 F.2d 398 (4th Cir. 1977); *see also* AR61853

19  (*FHWA Section 4(f) Policy Paper* (hereinafter, *FHWA Policy Paper*)) (school playgrounds

20  and athletic fields may serve substantial public recreational purpose).

21       Here, the record contains ample evidence that BHHS's athletic and recreational

22  facilities—which contain athletic fields, gymnasiums, a swimming pool, a track, and tennis

23  courts—are regularly used by the public for recreation, sports, and community events. *E.g.*,

24  AR35258 (noting that there are 100's of community events at these facilities each year, that

25  sports programs demand currently exceeds capacity, and that the City has no other facilities

26  with comparable capacities), 34269 (same), 34700-01 (describing high school athletic and

27  recreational facilities). Indeed, the City and BHUSD have entered a formal agreement that

28  provides for community use of BHUSD's facilities, including BHHS's athletic and

                                            33

1  recreational facilities. AR35258; FTAAR35272 (BHUSD letter referencing cooperative use

2  agreement between the City and School District and noting that the BHHS "campus athletic

3  fields are regularly used by the community at large"); Kolin Decl., Exs. A-B.

4        Even though BHUSD repeatedly informed the Agencies of this usage, Metro's Section

5  4(f) Report does not even mention, let alone discuss, any of this evidence. Instead, while

6  recognizing that BHHS contains "recreational facilities available for public use," the report

7  simply asserts in a table that these facilities do not have a "major purpose for park or

8  recreational activities" and, on that basis, summarily concludes that there is "no use" of these

9  facilities. AR6055 (Table 3-1, row 4, columns 6 & 7), 6056. As noted above, the report's

10 entire "analysis" of the Project's use of all protected park and recreational facilities consists

11 of a single sentence. AR6090.

12       Accordingly, as with its purported analysis of use of Reeves Park, FTA's

13 determination that BHHS's athletic and recreational facilities do not constitute 4(f) resources

14 is not based on any empirical evidence or reasoned analysis. Instead, as noted by FTA's

15 staff, it appears to have been drafted by Metro consultants who lacked even a basic

16 familiarity with Section 4(f)'s requirements. After initially objecting to these consultants'

17 shoddy work, FTA staff dropped the issue and failed to require the mandatory 4(f) analysis

18 they previously identified as absent from Metro's draft report. *See* Part II.A, *supra*. Because

19 the Agencies mistakenly concluded that BHHS's athletic and recreational facilities are not

20 4(f) resources, they never undertook the analysis necessary to evaluate whether the Project

21 would "use" those resources, and if so, whether that use could be avoided or its attendant

22 harms minimized. Again, however, there is ample record evidence that the Project will "use"

23 those facilities as that term is defined in 4(f). The Subway tunnels would "permanently

24 incorporate" land directly beneath BHHS. *See* AR1309. As a matter of law, therefore, the

25 Project will "use" these resources. *See* 23 C.F.R. § 774.17 ("Except as set forth in §§ 774.11

26 and 774.13, a 'use' of Section 4(f) property occurs: (1) [w]hen land is permanently

27 incorporated into a transportation facility."). In addition, the staging areas for the

28 Constellation Station—which are immediately adjacent to one BHHS playing field and

34

1  within a clear line of sight to other ball fields—will cause air pollution and significant noise

2  impacts at this recreational resource. AR5096, 5098.

3       Citing to the *FHWA Policy Paper*, the Section 4(f) Report nevertheless asserts that

4  tunneling does not constitute a use unless it, inter alia, "[c]auses disruption [that] would

5  permanently harm the purposes for which the park [or] recreation [area] was established."

6  AR6055. The *FHWA Policy Paper* (AR61856) does not cite any statutory, regulatory, or

7  case law support for this limitation on the regulatory definition. Thus it cannot validly limit

8  the conclusion that tunnels, as a matter of law, will "use" BHHS within the meaning of

9  Section 4(f). *See Auer v. Robbins*, 519 U.S. 452, 460 (1997) (agency interpretation of

10 regulation not valid if inconsistent with regulation). In any event, the referenced portion of

11 the *FHWA Policy Paper* does not address the analysis of "constructive use" required by

12 DOT's regulations, or a situation in which the transportation project is both tunneling

13 beneath a recreational resource and causing years of air pollution and noise at the resource.

14      In light of the record evidence establishing the Project's threat to BHHS's athletic and

15 recreational resources and without an analysis of the Project's use of these 4(f) resources,

16 FTA could not reasonably conclude that 4(f)'s protections did not apply. *Nat'l Parks*, 998

17 F.2d at 1533.

18 **III.   FTA's Clean Air Act Conformity Determination Was Arbitrary and Capricious.**

19      The federal Clean Air Act requires FTA to make a "conformity" determination prior to

20 funding certain activities, including transportation projects such as the Project. FTA must

21 make an affirmative finding that the "activities [to be funded] will not…cause or contribute

22 to any new violation of any [NAAQS] in any area…[and will not] increase the frequency or

23 severity of any existing violation of any [NAAQS] in any area." 42 U.S.C. § 7506(c)(1).

24 FTA included such a finding in its ROD, asserting that the Project "would neither cause new

25 $PM_{10}$ or $PM_{2.5}$ hot spots nor increase the frequency or severity of existing $PM_{10}$ or $PM_{2.5}$

26 violations." FTAAR43. However, this finding was arbitrary and should be annulled.

27      As noted in Part I.A, *supra*, in preparing the FEIS, Metro analyzed the subway's

28 ***operational*** impacts on air quality. Its consultant projected changes in traffic patterns as a

35

1   result of some people driving to the new subway stations and then used dispersion modeling

2   to conclude that these changes in traffic patterns would not cause any new NAAQS

3   violations or "hot spots." AR967-70. Not surprisingly, the FEIS concludes that the operation

4   of the subway—once built—will not cause any significant air quality issues, because it will

5   promote mass transit. AR970.

6        By marked contrast, the FEIS does not present any air dispersion modeling results or

7   "hot spot" analysis for the air quality issue that actually matters: the impacts of the Project's

8   massive-scale, long-term construction activities in close proximity to BHHS and other

9   sensitive uses. It is these construction activities that involve more than 100,000 diesel truck

10  trips through severely congested intersections in and around Beverly Hills (and elsewhere in

11  the region) and the intensive use of construction equipment for many years.[11]

12       Given this gaping hole in analysis, FTA had no basis for its conformity finding. No

13  hot spot analysis was prepared with respect to construction; the only construction-related

14  analysis presented focused entirely on the SCAQMD Thresholds, which relate to regional,

15  rather than local, air quality. *See* Part I.A.1, *supra.* With no substantive analysis, there is no

16  basis in the record for FTA's implicit finding that the construction activities will not cause or

17  contribute to localized violations of the NAAQS.[12]   Accordingly, FTA's conformity

18  determination should be annulled as arbitrary and capricious.

19  **IV.   FTA Violated NEPA by Refusing to Re-Open the NEPA Process to Assess New**
20  **Information Contradicting the FEIS's Assumptions regarding the Relative Risks**
    **of the Century City Station Options.**

21       After the FEIS was published, the Agencies, BHUSD, CGS, and others generated a

22  flurry of new studies about seismic faults and the safety of tunneling through Century City.

23  _____

24  [11] Metro's *Traffic Impact Analysis Report* indicates that many of the intersections have poor

25  levels of service (*i.e.*, Level-of-Service D, E or F) today and that levels of service are

26  expected to worsen over time, even after construction of the subway. *See* AR80586, 80627.

27  [12] The phrase "implicit finding" is used because FTA's conformity determination does not

28  mention the word "construction." FTAAR43-44.

THE CITY OF BEVERLY HILLS' MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 12-9861-GW (SSX)

1    *See* Clark Decl., Ex. 2. These reports were never released for public comment or

2    incorporated into the Agencies' environmental analysis. Yet they go straight to the crucial

3    assumption underlying the Agencies' most controversial siting decision: that the long-

4    planned-for station along Santa Monica Blvd. is precluded by the presence of an active

5    earthquake fault. AR1029. More importantly, these documents demonstrate that the

6    Agencies got it wrong. Detailed trenching, undertaken as part of these subsequent studies,

7    confirms that the WBHL is ***not active*** and does not preclude a Santa Monica Station that

8    would avoid tunneling under BHHS. FTAAR87699-705, 87729-929. But rather than prepare

9    an environmental assessment (EA) or supplemental EIS (SEIS) to evaluate and give the

10   public an opportunity to weigh in on this conflicting information, FTA relied on the opinion

11   of Metro's outside litigation counsel that the Agencies had proceeded correctly.

12        NEPA requires federal agencies to supplement an FEIS if "[t]here are significant new

13   circumstances or information relevant to environmental concerns and bearing on the

14   proposed action or its impacts."[13] The Ninth Circuit recently discussed this requirement in

15   circumstances analogous to the present case. *League of Wilderness Defenders v.*

16   *Connaughton*, Case No. 13-35653, 2014 WL 1814172 (9th Cir. May 8, 2014). The Forest

17   Service had relied on the assumed positive impacts of a Travel Management Plan (TMP) to

18   analyze impacts of a logging project on elk. *Id.* at *3. The court held that the subsequent

19   withdrawal of the TMP likely necessitated the preparation of an SEIS, noting that when the

20   public reviews an EIS to assess the harms and benefits of proposed approaches, it "should

21   not be required to parse the agency's statements…to determine which portions of the

22   agency's analysis rely on accurate and up-to-date information, and which portions are no

23   longer relevant." *Id.* In other words, an SEIS is required where necessary to prevent the

24   public from "proceeding on mistaken assumptions." *Id.* This concern is echoed in other

25   Ninth Circuit decisions. *See, e.g.*, *Alaska Wilderness*, 67 F.3d at 727-31 ("Because

26

---

27   [13] 40 C.F.R. § 1502.9. FTA regulations permit the agency to instead first prepare a

28   supplemental EA in order to determine whether an SEIS is required. 23 C.F.R. § 771.130(c).

elimination of the contract appears significantly to alter the range of viable alternatives available…, we hold that the Forest Service's decision not to reconsider land use alternatives in an [S]EIS…was not reasonable."); *Massachusetts v. Watt*, 716 F.2d 946, 948-50 (1st Cir. 1983) (changed assumption significantly reducing amount of recoverable oil required agency to rebalance environmental harms against possible benefits for each alternative).

Here, the FEIS concludes that the WBHL is an extension of the active Newport-Inglewood Fault and that it renders the Santa Monica East Station "not viable." AR1029. Consequently, decisionmakers and the public were presented with only one option to reach Century City: a tunnel directly under BHHS. FTA's assumptions about the WBHL thus fundamentally shaped the EIS and its ultimate decision about tunnel alignment.

Since the FEIS's release, new information has significantly eroded this key assumption. First, Leighton completed its trenching work beneath BHHS, through the exact fault lines that the Agencies had inferred—based on indirect methods—comprised the WBHL. Leighton found "direct geologic evidence that there has been no active faulting associated with the WBHL at [BHHS] for at least 70,000 to 100,000 years…." AR33026. In response to this hard data, Metro simply redrew its fault map to relocate the faults away from Leighton's trenches, effectively pretending that those newly drawn lines moved the faults themselves. AR38604. Then, in August 2012, the developers of 10000 Santa Monica Blvd.—a large property located between BHHS and the Santa Monica East Station and also directly atop the fault lines identified by Metro—completed trenching in advance of construction. Just like Leighton, these investigations revealed that "*active faults are not present* beneath the footprint of the proposed development." FTAAR87734 (emphasis added). CGS—the state agency tasked with identifying active faults—next stepped in. CGS confirmed that "evidence for active faulting related to the [WBHL] or the Santa Monica Fault Zone was not encountered" within the BHHS campus. FTAAR87704.

With this onslaught of information, the Agencies were finally forced to admit the error in their initial assumptions regarding the presence and activity of the WBHL beneath BHHS, 10000 Santa Monica Blvd. and the Santa Monica East Station itself. However, rather than

THE CITY OF BEVERLY HILLS' MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 12-9861-GW (SSX)

1  prepare an SEIS or EA to analyze the changed assumptions and how they might impact

2  alternatives, as required under *League of Wilderness Defenders* and *Alaska Wilderness*

3  *Recreation*, Metro quietly changed its opinion in a memo revealed only in this litigation.

4  FTAAR88622, 88616. "Based on Leighton's new trench data," Metro's consultants now

5  claim that the fault at the Santa Monica East Station location that they had previously

6  identified—which they originally claimed was due to the WBHL and was oriented roughly

7  North-South—is actually associated with the East-West Santa Monica Fault, again

8  conveniently outside of the scope of the work completed by Leighton, CGS, and 10000 Santa

9  Monica Blvd. *Id.* This flip flop is, once again, not accompanied by any new studies or

10 analysis. Rather, when faced with conflicting data, Metro and its consultants (advised on this

11 issue by Metro's litigation counsel) simply offered yet another new hypothesis to justify the

12 conclusion reached in the FEIS, in violation of NEPA. *Oregon Natural Desert Ass'n*, 625

13 F.3d at 1120 (court cannot accept post-hoc rationalizations advanced "'to defend past agency

14 action against attack'") (citation omitted).

15        NEPA requires federal agencies to grapple with the environmental trade-offs between

16 alternatives, rather than sweep them under the rug. *Watt*, 716 F.2d at 949. The extensive new

17 seismic information clearing Santa Monica East Station of potential faulting reweighs the

18 scales: where Metro's previous information on the WBHL assertedly **required** FTA to

19 choose Constellation Station, no matter the risks to BHHS, the new information presents

20 FTA with the opportunity to consider a true alternative.

21        An SEIS must be prepared when necessary to serve the dual purposes of NEPA: "to

22 assure that the public who might be affected by the proposed project be fully informed of the

23 proposal, [and] its impacts…; and to give the agency the benefit of informed comments and

24 suggestions as it takes a 'hard look' at the consequences of proposed actions." *Dubois*, 102

25 F.3d at 1291. FTA's actions here frustrated these twin aims. First, none of these new seismic

26 reports have been incorporated into FTA's environmental review or subject to public

27 scrutiny. Indeed, many of these studies have not even been released to the public. While

28 construction of the subway to Century City is still at least five years away (AR731), the

39

1  public is currently operating under the "mistaken assumption" that FTA had only one viable

2  option. *Connaughton*, 2014 WL 1814172, at *3. A supplemental EA or SEIS must be

3  prepared to allow the public to scrutinize the validity of the new seismic information and the

4  Agencies' ever-changing justifications in response.

5      Second, FTA's failure to require a supplemental EA or SEIS has precluded informed

6  federal decisionmaking. With each new report calling into question FTA's underlying

7  assumptions about seismic activity, the City and BHUSD repeatedly requested preparation of

8  an SEIS. AR34275, 35281-91; FTAAR3923, 3910, 3898-99, 3890-93, 87706-12, 87713-15,

9  87726-28. Yet the record indicates that FTA only moved to respond after the City moved to

10  supplement its complaint in this litigation. FTAAR88529. Instead of taking a "hard look" at

11  the new information, FTA again punted to Metro, asking the agency to prepare an

12  assessment for FTA's review. *Id.* The key document provided to FTA was prepared not by

13  Metro's staff scientists or consultants, but by Metro's outside litigation counsel, who had a

14  keen interest in justifying the Agencies' earlier decision to simply plow ahead. Wright Decl.

15  ¶¶ 6-7 (ECF No. 104-1). No one at FTA took a "hard look" at the new data or attempted to

16  reconcile it with the conflicting information contained in the EIS.

17                                    **CONCLUSION**

18      The City respectfully requests that this Court grant its motion for summary judgment.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

40

1  DATED: July 10, 2014                    SHUTE, MIHALY & WEINBERGER LLP

2

3

4                                          By:        /S/
                                                ROBERT S. PERLMUTTER
5                                               SARA A. CLARK

6

7                                          BRYAN CAVE LLP

8

9

10                                         By:        /S/
                                                PHILIP E. KARMEL
11                                              DONALD L. SAMUELS

12                                         *Attorneys for Plaintiff*
                                           *THE CITY OF BEVERLY HILLS,*
13                                         *a municipal corporation*

14

15    605860.16

16

17

18

19

20

21

22

23

24

25

26

27

28

THE CITY OF BEVERLY HILLS' MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 12-9861-GW (SSX)