UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-9861-GW(SSx) | Date | January 12, 2017 |
|---|---|---|---|
| Title | *Beverly Hills Unified School District v. Federal Transit Administration, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Katie Thibodeaux | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: | |
| Philip Karmel - by telephone | Jared S. Pettinato, US DOJ | |
| Jennifer S. Recine | Tiffany K. Wright | |

**PROCEEDINGS:**    **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [202]**

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. Plaintiff's Motion is DENIED. Plaintiff will have until January 13, 2017 to file a proposed order re denial of motion. Objections by defendants to the proposed order will be filed by January 14, 2017. Order to issue.

Additionally, parties will confer regarding FOIA requests and file a report/stipulation by January 18, 2017. The Court sets a hearing on disputes, if necessary, for January 23, 2017 at 8:30 a.m.

|  | : | 13 |
|---|---|---|
| | Initials of Preparer | JG |

*<u>Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin., et al.</u>*, Case No. CV-12-9861-GW (SSx) (consolidated with CV 13-1144-GW (SSx), CV 13-8609-GW (SSx), and CV 13-8621-GW (SSx)); Tentative Ruling on Plaintiff's Motion for Preliminary Injunction

Beverly Hills Unified School District ("Plaintiff") seeks to have the Court enjoin, until completion of the NEPA process, the Federal Transit Administration ("FTA") from entering into – or have the Court nullify the FTA's December 2016 execution of[1] – a $1.187 billion full funding grant agreement ("FFGA") with the Los Angeles County Metropolitan Transportation Authority ("Metro"), and to prevent a planned January 2017 execution by Metro of a design/build contract for Section 2 of the West Side Subway Extension ("the Project"), the subject focus of this long-running litigation. Plaintiff believes that if the FTA and Metro are allowed to take these steps, the present alignment for Section 2 of the Project will be locked-in, precluding the FTA's proper consideration of any alternatives to that alignment that is designed to occur in the continuing NEPA analysis for the Project, as ordered by this Court. If the Court were to give Plaintiff the injunctive relief it desires, it would run counter to the reasoning in, and nullify much of the result of, the remedial aspect of the Court's August 12, 2016, order in this case ("Remedy Order"). *See* Docket No. 188. Thus, the Court will deny Plaintiff's motion.

In the Remedy Order, the Court noted that Plaintiff had sought, among other relief, 1) a declaratory judgment that the FTA would have to issue a new or amended Record of Decision ("ROD") before providing any funding or entering into any grant agreement for Phase 2 of the Project, and 2) a declaratory judgment obligating the FTA to take appropriate action such that Metro will not undertake any action, such as acquiring property or entering into design or construction contracts, that would pre-determine the course of subway construction. *See* Docket No. 188, at pg. 3 of 23. The Court did not issue either of these forms of relief.

While the Court did order the FTA to engage in further NEPA and Section 4(f) analysis, *see id.* at pg. 8 of 23, it explained why it would *not* vacate the ROD already in place in connection with the Project. Under the analysis the Court determined was

---

[1] At the time Plaintiff filed its preliminary injunction motion, Metro had not yet executed the Full Funding Grant Agreement. In December 2016, it did.

applicable to its remedy decision by virtue of *California Communities Against Toxics v. United States Environmental Protection Agency*, 688 F.3d 989 (9th Cir. 2012), the Court observed that "a number of initial and/or preparatory steps need to be taken (and/or at this point in time, need to be completed)" for Phase 2 of the Project. *See* Docket No. 188, at pg. 13 of 23. This included securing a FFGA and executing a design/build contract for Phase 2. *See id.* at pgs. 13-18 of 23. Taking account of the impact a vacatur of the ROD would have on those steps with regard to Phase 2 of the Project, the Court found "that the issuance of a vacatur to overturn the ROD (and/or those portions of the FEIS which would cause Metro to be unable to secure the FFGA for the 2016 and 2017 fiscal years for Phase 2 of the Project or which would bar Metro from engaging in necessary pre-construction preparatory endeavors) would pose the type of dire consequences which the Ninth Circuit in *Cal. Cmtys. Against Toxics* found to be sufficient to justify not ordering a vacatur." *Id.* at pg. 16 of 23. For good measure, the Court also determined that vacatur would not be warranted under the standard test for injunctive relief set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). *See id.* at pgs. 21-22 of 23. The impact on the progression of Phase 2 was part of the Court's assessment of the balancing of the equities and the public interest. *See id.* at pg. 22.

While the Court did, in its Remedy Order, offer to Plaintiff the opportunity to raise with the Court – without specifically defining the proper procedural vehicle for doing so – a contention that "on remand the FTA [was acting] impermissibly or inappropriately so as to raise a basis for [a] charge of pre-determination or bad faith," *id.* at pg. 19 of 23, an assertion that the FTA and/or Metro are doing just that by virtue of engaging in behavior that the Court specifically contemplated in devising the applicable remedy will not pass muster. Whatever the proper procedural standards cabining this Court's consideration of this motion might be, a ruling in Plaintiff's favor on this point would be entirely inconsistent with this Court's approach in its Remedy Order. The only change in circumstances from what was before the Court at the time it issued the Remedy Order is the fact that the FFGA was issued three months later than Metro advised was required in order to avoid delaying Phase 2 of the Project. This change in timing, while perhaps raising questions about the actual temporal urgency of the FTA's/Metro's previously-stated timeline, is not enough for the Court to conclude its remedies decision

was in error.

Beyond those points, the Court is not entirely convinced by Plaintiff's assertion that any alignment analysis would necessarily be "locked-in" by virtue of the FFGA and design/build contract being executed. Plaintiff has presented an expert opinion on the question of whether the design/build contract can be amended or altered if the chosen alignment changes following the FTA's further NEPA analysis. Timothy B. Buresh is the president of a consulting firm that provides professional and management services for large-scale public works projects. *See* Buresh Decl. (Docket No. 202-16), ¶ 1. He has concluded that "once Metro signs the Section 2 Contract it will be nearly impossible in practice for Metro to change the alignment of Section 2, regardless of the outcome of the Supplemental Environmental Impact Statement mandated by this Court." *Id.* ¶ 8; *see also id.* ¶ 12 (concluding that "even minor deviations from the terms of a design/build contract" are "difficult" and "material changes, such as changes to alignment and station locations and the addition of new mitigation measures, [are] nearly impossible in practice").

Buresh reached this conclusion despite acknowledging that, after execution of the Section 2 Contract, "any owner-directed changes or variations to any element set forth in the Basis of Design must be accomplished by change order(s)." *Id.* ¶ 8; *see also id.* ¶ 9 ("Change orders cannot be accomplished without renegotiation of the contract between Metro and the design/build contractor. Through those renegotiations Metro and the design build contractor must reach new agreements on the scope, cost, and schedule impact of any change(s). Additionally, Metro's by-laws require that any change which increases the Section 2 cost requires approval of Metro's Board of Directors."). In other words, there *is* a method for accomplishing such a change. It has simply been Buresh's "experience" that "the adverse economic and scheduling consequences to a public works project that result from the invocation of a substantial scope change process that requires a renegotiation of the contract effectively undermine the possibility of alterations to a project once a design/build contract is signed." *Id.* ¶ 9.

While the FTA did not directly address Buresh's expert report in its Opposition brief, it has plainly argued that – as Buresh concedes with respect to the design/build contract – changes are possible in connection with both the FFGA and design/build

3

contract.[2] Having represented to the Court that those agreements may be changed, the FTA (and/or Metro) will not be heard at a later date to claim that they may not, or that doing so would be too costly as a basis for asserting that the alignment cannot be changed. This is, in fact, reflective of the larger point the FTA needs to be clear about: the Court will not allow the FTA to rely on execution of the FFGA or design/build contract for Phase 2, or any inertia caused thereby, to support the suitability of any further NEPA analysis the Court has ordered the FTA to undertake.

Aside from an inconsistency with the Remedy Order that would be created as a result of a ruling in Plaintiff's favor on this motion, the Court would also reject Plaintiff's motion under the traditional test(s) for injunctive relief. The Court has already explained in its Remedy Order why, given the fact that actual construction is not set to begin until January 2018, it would resolve the balancing of the equities/hardships and the public interest in the FTA's favor[3] (meaning that even under a "sliding scale" approach, the Court would not grant an injunction here, *see Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 n.4 (9th Cir. 2016) (noting that preliminary injunctive relief is also available in the Ninth Circuit under "sliding scale" approach where plaintiff raises "serious questions" as to the merits and "balance of hardships tips sharply in [plaintiff's] favor") (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Plaintiff's reliance, for purposes of demonstrating a likelihood of success on the merits, on restrictions certain statutes, regulations and "guidance" allegedly place on the FTA's ability to award an FFGA, is misplaced, as none of the claims Plaintiff has raised in its Amended Complaint in this case are founded upon those statutes/regulations/guidance. *See World Wide Rush, LLC v. City of Los Angeles*, 563 F.Supp.2d 1132, 1147-48 (C.D. Cal. 2008) (refusing to issue injunction based on claim not pled in complaint); *see also Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015)

---

[2] The same is true of Metro, in its brief opposing Plaintiff's motion for a preliminary injunction in *Beverly Hills Unified School District v. Los Angeles County Metropolitan Transportation Authority, et al.*, CV 16-8390-GW (SSx), also set for hearing this day.

[3] Plaintiff insists that the recent passage of "Measure M" and the funding made available thereby offsets any concern about delays that would occur if an injunction is entered. The FTA convincingly responds that Plaintiff's opinion about what impact Measure M funds will have on construction timelines is "sheer speculation" which "carries no weight." Docket No. 207, at 24:25-25:2.

4

("Though new assertions of misconduct might support additional claims against a defendant, they do not support preliminary injunctions entirely unrelated to the conduct asserted in the underlying complaint."); *id.* ("A preliminary injunction is appropriate when it grants relief of the same nature as that to be finally granted."); *id.* ("[T]here must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint. This requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself. The relationship between the preliminary injunction and the underlying complaint is sufficiently strong where the preliminary injunction would grant 'relief of the same character as that which may be granted finally.'") (quoting *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945)). Indeed, the FTA persuasively argues that what Plaintiff is now attempting to do is to prematurely challenge an ongoing NEPA process before a final agency action has occurred. Finally, any irreparable harm that is tied to the effect of actual construction on property under Plaintiff's control[4] is simply not imminent, and any irreparable harm tied to a procedural violation under NEPA ignores the fact that Plaintiff is not limited, in any way, in assessing, questioning, and criticizing the FTA's continuing NEPA analysis upon publication and distribution of the upcoming supplemental environmental impact statements.

In sum, the Court denies Plaintiff's motion.

---

[4] This was the alleged irreparable harm Plaintiff focused upon in its opening brief. *See* Docket No. 202-1, at 16:21-17:11. In its Reply brief, Plaintiff switched focus, at least partially, to "procedural injuries" constituting irreparable harm. Docket No. 208, at 18:26-19:7. New arguments are not permitted in a reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").